UNITED STATES of America, Plaintiff-Appellee,

v.

James Milton COTTEN and William Lowell Roberts, Defendants-Appellants.

No. 72–1242.

United States Court of Appeals, Ninth Circuit.

Jan. 2, 1973.

Certiorari Denied April 16, 1973.
See 93 S.Ct. 1913.

John S. Edmunds (argued), of Mattoch, Edmunds & Kemper, Honolulu, Hawaii, for defendants-appellants.

Gary D. Jackson, Atty. (argued), Washington, D. C., Robert K. Fukuda, U. S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Before BARNES and TRASK, Circuit Judges, and BATTIN,* District Judge.

BATTIN, District Judge:

The appellants, James Milton Cotten, and William Lowell Roberts, appeal their convictions in the United States District Court for the District of Hawaii for violations of 18 U.S.C. § 371, conspiracy, and 18 U.S.C. § 641, theft of Government property. The criminality of the conduct which resulted in the convictions is not in doubt. The only questions raised on appeal concern the jurisdiction of the district court.

The expansive nature of the case required that it be submitted to the court upon an agreed statement of facts.[1] Those facts are important to the questions raised and are substantially as follows:

During 1969, James Milton Cotten and William Lowell Roberts, who were civilian United States Citizens in the Republic of Viet Nam, conspired to defraud the United States by knowingly converting money and other property of the United States Military Exchanges in Japan to their own use and for the use of others. In furtherance of their conspiracy, they obtained falsified military identification cards, falsified military orders showing them to be on authorized "R&R" leave in Japan and opened a checking account.

They arrived at Japan in April, 1969, stayed there approximately two weeks, and returned to the Republic of Viet Nam. During their stay in Japan, they negotiated numerous worthless checks drawn on the previously mentioned account at several United States Military Exchanges. The checks were exchanged for cash and for merchandise which was then sent through the military mail system to military acquaintances of the defendants in Viet Nam.

On August 5, 1970, a twenty-three count indictment was brought against the appellants in the Northern District of California. Both appellants were charged with conspiracy to defraud the United States[2] and with several substantive counts of theft of Government property[3] by means of the worthless checks.

At the time of the indictment, the appellants were still in the Republic of Viet Nam. Immediately after the return of the indictments, the United States Department of State, pursuant to prior arrangements, instituted proceedings to revoke the appellants' passports and to arrange their deportation to this country. In the meantime, the appellants were arrested by Vietnamese officials and charged with several minor local offenses. The Vietnamese officials refused to relinquish custody of the appellants or their passports until final disposition of the local charges. The United States does not have an extradition treaty with the Republic of Viet Nam.

After weeks of negotiation, the Vietnamese charges against the appellants were dropped and, on separate occasions, the appellants were delivered to United States officials waiting to take them to Hawaii. Once in Hawaii, the appellants were arrested and subsequently delivered to the custody of the United States Marshal in San Francisco. Eventually, the parties made and the district court in California granted separate motions

---

* Honorable James F. Battin, United States District Judge, District of Montana, sitting by designation.

1. See "Joint Motion to Submit the Case to the Court Upon the Government's Proof As of All Material Issues of Fact".

2. 18 U.S.C. § 371.

3. 18 U.S.C. § 641.

for a change of venue to the District of Hawaii. Both appellants timely filed motions to dismiss for want of jurisdiction over the person and to dismiss for want of jurisdiction over the offense. The court denied the motions.

Although the circumstances of the return of Cotten and Roberts to the United States are important to their claim of violation of their Constitutional rights, they will not be set out at length. The briefs and record of the court below reflect the fact that the appellants were forcibly returned to this country. A synopsis of those facts appears in the margin.[4]

From the extensive factual background of the case, only two issues emerge on appeal:

1. Whether the United States District Court for the District of Hawaii had jurisdiction over the persons of the appellants for violations of 18 U. S.C. §§ 641 and 371 when the appellants were involuntarily removed from the Republic of Viet Nam to the United States for trial; and

2. Whether the United States has jurisdiction to prosecute the appellants for violating 18 U.S.C. §§ 371 and 641 where all the acts alleged

---

4. The following condensation of the facts is principally taken from the appellants' brief:

On October 4, 1970, the Vietnamese charges against Cotten were dropped. He was taken in a Vietnamese vehicle, accompanied by a United States Navy vehicle, to Tan Son Nhut Airport in Saigon. When he arrived at the airport, appellant Cotten was wearing handcuffs and leg irons which belonged to the United States [Transcript, p. 38]. Mr. Hubbard, an agent of the United States Naval Investigative Service, took possession of Cotten's passport and made certain that Cotten entered the United States Military aircraft standing by to take him to the United States. On the airplane, still in handcuffs and leg irons, Cotten was seated by two other Naval Investigative Service agents. At this point, Cotten protested that he was being kidnapped. He was not told that he was under arrest, although he was treated as a "prisoner". During the flight Cotten protested physically and was subdued and placed on the deck of the aircraft and secured, both arms and legs, by means of cargo chains. During the course of this trip, in addition to being chained to the floor of the aircraft, Cotten was struck in the back of the head and otherwise subdued because of his protest against being kidnapped. Upon arrival in Honolulu, Cotten was turned over to the Federal Marshal.

On December 7, 1970, Vietnamese charges were dropped against appellant Roberts, and he was likewise forcibly returned to the United States against his wishes. The circumstances of Roberts' removal to the United States are substantially as follows:

Roberts was taken from the Vietnamese Immigration Detention Jail in a jeep vehicle to the Tan Son Nhut airport in Saigon, by Vietnamese officials. The jeep was accompanied by a vehicle belonging to the United States Naval Investigative Service and occupied by its agents. Roberts was taken to an office of the United States Navy located within the confines of the Tan Son Nhut Air Force Base portion of the airport and searched by Vietnamese officials in the presence of United States officials. The Vietnamese officials accompanying Roberts removed their handcuffs and an agent of the United States Naval Investigative Service placed handcuffs on him.

Roberts protested to an agent of the Naval Investigative Force that he (Roberts) did not wish to be taken from the Republic of Viet Nam. Roberts was taken to the loading ramp of an aircraft belonging to the United States and was forced to enter the aircraft. Roberts protested to all present that he was being taken from Viet Nam against his will. The Naval Investigative Service agent obtained Roberts' passport.

At no time did any representative of the United States notify Roberts of the nature of any charges pending against him. Roberts was handcuffed with handcuffs belonging to the United States of America throughout the course of his flight to Honolulu, Hawaii. Upon arrival in Honolulu, Hawaii, Roberts was arrested by two United States Marshals. While riding in a car from the airport to downtown Honolulu, Roberts was advised of the charges against him by United States Attorney Joseph M. Gedan.

which constitute the crimes occurred in foreign countries.

We will dispose of the issues in the order designated above, for if the first issue is decided adversely to the Government, the second issue will be moot.

## I. PERSONAL JURISDICTION.

The appellants contend that the conduct of the Government officials in returning them to the United States to face the charges here in question was so blatantly violative of their constitutional rights as to deprive the court below of personal jurisdiction. Their argument is based on the concept of fundamental fairness they correctly view as embodied in the due process standard of both the Fifth and Fourteenth Amendments.

Operating from this obviously acceptable premise, the appellants point to cases such as Rochin v. California,[5] and Miranda v. Arizona, Katz v. United States, and Sorrells v. United States,[6] in which the Supreme Court of the United States has established standards for the fair administration of criminal justice. They argue that the conduct of the Government agents in this case is so shockingly offensive of these standards and to the conscience of civilized men as to require dismissal for want of jurisdiction of their persons.

The appellants urge that the seizure of their persons constituted a violation of the Fourth Amendment. It is their position that the Government's actual physical seizure of each person, rather than evidence which might have been suppressed if seized under similar circumstances, is no less violative of due process than had physical evidence been seized. The same interest analysis which supports the exclusionary rule is urged by the appellants to support dismissal of these charges. It is their contention that the present case is one in which the courts should take notice of the obnoxious and illegal conduct of Government agents and react by reversing the trial court's refusal to dismiss the case.

Finally, appellants make an analogy to civil procedure. They note that it is a well-settled rule that a defendant who is lured into another state by fraud or force will not be subject to the jurisdiction of that state. Beale, Conflict of Laws, Sections 78.3 and 78.4 (1935). They urge the rationale of the rule to be that a state will not allow a plaintiff to profit from his underhanded conduct. Similarly, they continue, a state should not be permitted to benefit from the illegal activities of its agents. Thus, a court should exercise its discretionary powers and refuse to sanction such unreasonable conduct, as is found here, by dismissing this case where police conduct is so blatantly in violation of due process.

In their reply brief, the appellants raise a new issue regarding the jurisdiction over their persons: that the use of a United States Air Force aircraft and personnel to forcibly return the appellants to the United States is a violation of 18 U.S.C. § 1385. That section provides, in pertinent part:

"Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a *posse comitatus* or otherwise to execute the laws [violates this section]."

It is the appellants' view that the use of a United States Air Force aircraft and attendant personnel to transport them to the United States to face charges for civilian crimes was a criminal act, and therefore requires either a dismissal of charges or a finding of lack of jurisdiction.

It is our conclusion that the court below was not without jurisdiction. The

5. 342 U.S. 165, 72 S.Ct. 205. 96 L.Ed. 183 (1952).

6. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); and 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), respectively.

very narrow issue presented here questions only the power of the lower court to proceed.[7] We are compelled by old and well-established authority to conclude that the court below did have jurisdiction over the persons of the appellants.

█ Conceding that appellants were in fact kidnapped or forcibly removed without their consent to the territorial limits of the United States by and under order of government personnel, that fact does not preclude assertion of jurisdiction over their persons.[8]

"There are authorities of the highest respectability which hold that such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court."

Ker, Note 8, 117 U.S. at 444, 7 S.Ct. at 229.

The Supreme Court has not since abandoned the *Ker* principle,[9] and it has been widely reasserted, though at times critically, by the Circuits.[10] The fact that it was state court jurisdiction that was questioned in the early cases which established the rule is unimportant. The protection sought in the cases enunciating the principle was that of the Federal Constitution. The Supreme Court found that none was afforded then; we are unable to find any now.[11]

As did the Tenth Circuit in the *Hobson,* case, we find nothing in Mapp v. Ohio [12] or Fay v. Noia,[13] nor in the cases cited by the appellants,[14] which implies that the expanded scope of protection afforded to accused persons by both the Fifth and Fourteenth Amendments would preclude trial of the accused by a court of competent jurisdiction. The remedy for the conduct appellants com-

7. Collateral issues, which are argued by brief and which may arise from the same circumstances and which involve questions of the availability to the appellants of independent remedies against those whose conduct they complain of, are not relevant to the jurisdictional issue we find to confront the court. That the appellants may be entitled to reinstatement of their passports or vindication by judicial proceedings or administrative hearings with resultant imposition of penalties or sanctions does not affect consideration of the viability of the lower court's assumption of jurisdiction.

8. Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) ; Mahon v. Justice, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283 (1888).

9. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

10. United States v. Hamilton, 460 F.2d 1270 (9th Cir. 1972) ; Bacon v. United States, 449 F.2d 933 (9th Cir. 1971) ; United States ex rel. Calhoun v. Twomey, 454 F.2d 326 (7th Cir. 1971) ; Hobson v. Crouse, 332 F.2d 561 (10th Cir. 1964) ; Devine v. Hand, 287 F.2d 687 (10th Cir. 1961) ; Strand v. Schmittroth, 251 F.2d 590 (9th Cir. 1957), cert. dismissed, 355 U.S. 886, 78 S.Ct. 258, 2 L.Ed.2d 186 (1958) ; Wentz v. United States, 244 F.2d 172 (9th Cir. 1957), cert. den., 355

U.S. 806, 78 S.Ct. 49, 2 L.Ed.2d 50 (1957) ; Chandler v. United States, 171 F.2d 921 (1st Cir. 1948), cert. den., 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949) ; Sheehan v. Huff, 78 App.D.C. 391, 142 F.2d 81 (1944), cert. den., 322 U.S. 764, 64 S.Ct. 1287, 88 L.Ed. 1591 (1944).

11. While the court recognizes that the vitality of the doctrine we follow may be in doubt, and that federal officers might be held to a higher standard of conduct than their state counterparts, we will not strike it down. Recent legislation and constitutional protections enunciated in the last decade provide viable alternative means of coping with undisciplined law enforcement activities.

12. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

13. 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

14. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) ; Collier v. Vaccaro, 51 F.2d 17 (4th Cir. 1931) ; Villareal v. Hammond, 74 F.2d 503 (5th Cir. 1934) ; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ; Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ; Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

plain of, if one exists, is not the bar to the prosecution they suggest when urging the court below was without jurisdiction.

The novel argument of appellants' counsel that the use of military personnel and equipment, in purported violation of 18 U.S.C. § 1385, precluding a *posse comitatus*, so violated their due process rights as to require either dismissal of charges or a finding of lack of jurisdiction necessarily falls to the same rationale. The remedy requested exceeds that required by the conduct. The remedy for appellants is not a finding that their criminal activities go unpunished because the proper forum was razed by the conduct of law enforcement personnel. The *Ker* principle controls and the rationale of the United States Supreme Court in *Frisbie*, denying that a bar to prosecution was imposed in similar circumstances by the Federal Kidnapping Act, applies equally to the *posse comitatus* statute. We therefore find nothing in the record which justifies a conclusion that the court below was without jurisdiction of the appellants' persons.

## II. JURISDICTION OF THE OFFENSE.

The second issue raised questions the jurisdiction of the court below over the crimes charged. Appellants argue that the penal laws they are charged with violating have no extraterritorial application and therefore the court below was without jurisdiction. For the reasons delineated below, we disagree, find that the court below was possessed of the power to proceed, and affirm appellants' convictions.

As we will more fully note below, we find that there can be no serious doubt as to the extraterritorial applicability of the conspiracy section. We will therefore address this discussion only to the applicability of the theft section.

Basic to this discussion is the premise that Congress has the power to attach extraterritorial effect to its penal enactments. That power is implicit in the several rulings which are herein relied upon and succinctly expressed in Blackmer v. United States: [15]

"While the legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States, the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power."

*Blackmer, supra* note 15, at 437, 52 S. Ct. at 254.

Extraterritorial criminal jurisdiction is said to be justifiable under one or more international law theories, depending upon the circumstances of the offense.[16] To author comment upon the justification for extension of the section in question under the law of nations seems unnecessary since no sovereign is offended by the arrest and conviction of these appellants. Suffice it to say that if extraterritorial application is comprehended by 18 U.S.C. § 641, it is jusified by the international law "objective territorial principle" which condones jurisdiction of an offense committed elsewhere but taking affect within a sovereign that proscribes the conduct and is asserting jurisdiction.[17] This nation has a paramount interest in protecting its property, wherever located, by assertion of its penal laws.

Having concluded that the extraterritorial application of the section in question would be both constitutionally and internationally permissible, it remains to be determined whether the sec-

15. 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932).

16. Rivard v. United States, 375 F.2d 882 (5th Cir. 1967), cert. den., Graleau v. United States, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967).

17. *Rivard, supra* note 16, at 886, 88 S.Ct. 151.

tion in fact has extraterritorial application. The section does not express the scope of its application and therefore the court is faced with finding the construction that Congress intended. Absent evidence of a contrary intent, the presumption against extraterritorial application must stand.[18]

■ We find strong evidence that the section was intended to have extraterritorial application. It is inconceivable that Congress, in enacting Section 641, would proscribe only the theft of government property located within the territorial boundaries of the nation. The rule and presumption of territorial application

" . . . should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents.

"[Some offenses] are such that to limit their *locus* to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home.

"In such cases, Congress has not thought it necessary to make specific provision in the law that the *locus* shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense." [19]

In *Bowman*, the Supreme Court found that a law of the United States proscribing, in short, the presentment of false claims to the Government or its officers, larceny by trick, and conspiracy to accomplish either, had extraterritorial ap-

plication. *Bowman* implicitly gives extraterritorial effect to 18 U.S.C. § 371. Conspiracy to defraud or to perpetrate crimes against this nation are within its power to punish. This court recently gave express extraterritorial application to Section 371 on the strength of *Bowman*.[20] We find no reason to limit or vary our conclusion. The conspiracy statute applies extraterritorially.

Applying the *Bowman* rationale to the theft statute compels a similar conclusion as to its applicability. Two citizens of this country have violated its laws while without its territory. The law violated proscribes the taking of Government property. That law certainly represents an exercise by the Government of its right to defend itself from obstructions and frauds. To say that it is limited in its application is to allow and condone lawlessness at Government installations wherever located. We must conclude that the enactment is a member of that class of proscriptions which is not logically dependent upon the locality of violation for jurisdiction, and therefore give it extraterritorial application at least where, as here, a citizen of this nation violates it while in a foreign country.

Although we are convinced by the nature of the conduct prohibited by the section that Congress intended that Section 641 have the scope we here attribute to it, we are also satisfied that there exists other evidence, aside from the necessary implication of the statute, which rebuts the presumption of territorial application.

The Government's arguments in this regard are persuasive. Our research verifies that Congress, when it amended the criminal venue provisions of 18 U.S. C. § 3238, had before it testimony and documents which indicated that the amendment was necessary because cer-

18. United States v. Pizzarusso, 388 F.2d 8 (2nd Cir. 1968), cert. den., 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909).

19. United States v. Bowman, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922).

20. Brulay v. United States, 383 F.2d 345 (9th Cir. 1967), cert. den., 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967).

tain criminal activity against the Government and prosecutable by the Government, including violations of Section 641, could be committed abroad, but prosecution avoided because of defects in the venue provision. Presumptively, Congress amended the venue provision with the purpose, among others, of providing a forum for the prosecution of offenses which were already cognizable under the jurisdiction of district courts.[21] 18 U.S.C. § 3238, as amended in 1963, presupposes district court jurisdiction of offenses committed extraterritorially. Its legislative history indicates that the presupposition included the offenses described by the section we here consider. Thus, the inference that Congress intended Section 641 to have extraterritorial application is readily made.

To conclude otherwise would be clearly erroneous. It is not reasonable to imagine that Congress intended, by Section 641, to punish this type of offense against the United States when committed domestically but to leave it unpunished when committed abroad. Section 641 is not susceptible to that construction. It prohibits conduct which is obstructive of the functions of government. The *locus* of the conduct is not relevant to the end sought by the enactment. The effective operation of government cannot condone the hiatus in the law that a contrary construction would cause. The only reasonable construction of Section 641 is that it prohibits theft of government property wherever located.

We therefore hold that when a citizen of this country, while without the territorial jurisdiction of the United States, violates 18 U.S.C. § 641, he is amenable to resulting criminal prosecution in United States District Courts. He is likewise answerable to charges of conspiring to violate that section under similar circumstances.

The appellants' convictions are affirmed.

---

21. See: 1963 U.S.C.C.A.N. 660 et seq.