UNITED STATES of America,
Plaintiff,

v.

Pasquale Charles MARZANO et al.,
Defendants.

No. 74 CR 806.

United States District Court,
N. D. Illinois, E. D.

Jan. 28, 1975.

Asst. U. S. Attys. James Breen and Michael King for U. S. Atty. James R. Thompson, Chicago, Ill., for United States.

Joseph Oteri, Martin Weinberg and Thomas Troy, Boston, Mass., for defendant DiFonzo.

Julius L. Echeles, Chicago, Ill., for defendant Marzano.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes before the Court on the motions of defendants Luigi Michael DiFonzo and Pasquale Charles Marzano for the Court to discharge them from custody and to suppress certain evidence.

The defendants in this action were named in an indictment presented before this Court on November 7, 1974 accusing them of stealing an estimated 4.3 million dollars from the headquarters of the Purolator Company located here in Chi-

cago. Defendants DiFonzo and Marzano were arrested in Miami, Florida on October 31, 1974, by agents of the Federal Bureau of Investigation. They were immediately placed under arrest upon disembarking from an airplane which had just arrived from Grand Cayman Island in the British West Indies.

In support of their motion defendants charge that: "[t]he Government's illegal, forcible abduction of defendants from the British West Indies deprived defendants of their rights to due process of law, and therefore this Court must divest itself of personal jurisdiction over each of them, and discharge them." On January 24, 1975, this Court held an evidentiary hearing directed at determining the nature of defendants' arrest. In addition counsel for defendants and the Government have filed extensive briefs on this issue.

There appears to be no serious dispute as to the facts surrounding the defendants' return to the United States. In no way did the United States Government illegally or forcibly abduct the defendants from the British West Indies. In fact, the evidence is manifestly clear the the Federal Bureau of Investigation played little or no part in the return of the defendants to the United States. A review of the evidence indicates that the defendants' return to the United States resulted principally from the efforts of one Grand Cayman police officer, Detective Superintendent Derrick Tricker.

In summary, Supt. Tricker testified that he was aware of the fact that the defendants were present on the Island and had in their possession a large quantity of American currency. When contacted by the F.B.I. he agreed to meet two agents of the Bureau who were attempting to locate the defendants. However, Supt. Tricker admonished the agents upon arriving on the Island that they could not carry weapons (prohibited under Island law) nor could they interrogate or to take into custody the defendants. As he testified, "I informed them that they had no jurisdiction but allowed them to accompany me

in my investigation." At the hearing the F.B.I. agents totally corroborated Supt. Tricker's testimony. The agents did not take the defendants into custody nor even speak to the defendants about the crime committed and the ensuing investigation by American authorities. No evidence to the contrary was offered.

On the morning of October 31, Supt. Tricker asked the defendants to board a plane bound for Miami. He had previously taken defendants into custody for various infractions of Grand Cayman law. At no time did the defendants resist boarding the flight for Miami. On no occasion did agents of the F.B.I. actively involve themselves in the process whereby the defendants returned to the United States.* Even if the F.B.I. agents had wanted to arrest, illegally kidnap, or forcibly abduct the defendants, it was clear that Supt. Tricker would not permit such actions since the American agents were without any form of authority or jurisdiction on the Island. Indeed, as Supt. Tricker made imminently clear by his testimony, he was the one responsible for defendants' return to the United States, not the F.B.I. agents. The agents throughout the time in question were mere observers.

## JURISDICTION IS NOT AFFECTED BY THE METHOD IN WHICH THE DEFENDANTS WERE BROUGHT BEFORE THE COURT.

■ It has been asserted by the defendants that this Court has not acquired jurisdiction over them because their return to the United States violated due process and a British-American extradition treaty. Yet it is well settled that the factors surrounding the presence of a defendant in a jurisdiction are generally irrelevant in a criminal prosecution. Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96

L.Ed. 541 (1952); United States ex rel. Calhoun v. Twomey, 454 F.2d 326 (7th Cir. 1971); United States v. Rodriquez y Paz, 435 F.2d 1304 (5th Cir. 1970); In Re Chan Kam-Shu, 477 F.2d 333 (5th Cir. 1973); Hobson v. Crouse, 332 F.2d 561 (10th Cir. 1964); Chandler v. United States, 171 F.2d 921 (1st Cir. 1948). The Supreme Court of the United States established this rule in 1886 and has not yet departed from it.

In Ker v. Illinois, supra, 119 U.S. at 440, 7 S.Ct. at 227, the Supreme Court stated:

"We do not intend to say that there may not be proceedings previous to the trial, in regard to which the prisoner could invoke in some manner the provisions of this clause of the constitution, but, for mere irregularities in the manner in which he may be brought into the custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in a regular indictment."

The Seventh Circuit, in United States ex rel. Calhoun v. Twomey, *supra*, 454 F.2d at 326, commenting on *Ker* and *Frisbie*, stated:

"But we are aware of no decision of the Supreme Court of the United States which rejects the teaching of these cases that absent some other factor which has resulted in a forfeiture of jurisdiction, the method by which a person is returned to a State does not affect that State's jurisdiction over him. Once a person is within the jurisdiction of a State and held under valid process, the circumstances surrounding his being there will not be inquired into," 454 F.2d at 328.

In establishing this rule, the Supreme Court was cognizant of both due process and treaty arguments.

The contention that the recent expansion of procedural due process by the Supreme Court impliedly overrules the

---

* The F.B.I. did agree to pay for the cost of defendants' airfare to Miami. In addition, the Bureau paid for the airfare of a Grand Cayman officer who accompanied the defendants to the United States.

*Ker* and *Frisbie* line of cases has not been widely successful. The Seventh Circuit implicitly rejected it in United States ex rel. Calhoun v. Twomey, *supra.* The Ninth and Tenth Circuits have explicitly rejected it. United States v. Cotten, 471 F.2d 744 (9th Cir. 1973). Hobson v. Crouse, *supra* 332 F.2d at 561. In *Cotten, supra,* the court stated:

> "As did the Tenth Circuit in the *Hobson* case, we find nothing in Mapp v. Ohio, [367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081,] or Fay v. Noia [372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837], nor in the cases cited by the appellants, which implies that the expanded scope of protection afforded to accused persons by both the Fifth and Fourteenth Amendments would preclude trial of the accused by a court of competent jurisdiction. The remedy for the conduct appellants complain of, if one exists, is not the bar to the prosecution they suggest when urging the court below was without jurisdiction," 471 F.2d at 748–749.

The argument that Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 also implicitly overruled the *Ker-Frisbie* doctrine was also rejected by the Ninth Circuit in *Cotten, supra* 471 F.2d at 748.

Defendants place great reliance upon United States v. Toscanino, 500 F.2d 267 (2nd Cir. 1974) claiming that this decision shows the invalidity of the *Ker-Frisbie* rule. The facts in the *Toscanino* case are totally different than what occurred in the instant case. It is like comparing a domestic arrest to an international kidnapping.

Toscanino charged and was prepared to prove that on January 6, 1973, he and his seven-month pregnant wife had been lured to a deserted area in Montevideo by seven Uruguayan policemen, acting as paid agents of the United States government. Toscanino was knocked unconscious with a gun, in full view of his wife, bound and blindfolded, and thrown into the rear seat of a car. During a long and circuitous trip to the Brazilian border his abductors dodged the Uru-guayan authorities, and at one point, a gun was placed to Toscanino's head to compel him to lie quietly while a Uruguayan military convoy passed.

Toscanino was eventually brought to Brasilia, where over a period of seventeen days he was incessantly subjected to brutal torture and interrogation by Brazilians acting as agents of the United States government. His captors, he claimed, denied him sleep and all forms of nourishment for days at a time. He was fed only intravenously in amounts barely sufficient to keep him alive. He was compelled to walk up and down a hallway for seven or eight hours at a time, and when he fell, was kicked and beaten. To induce him to respond to the interrogation, his fingers were pinched with metal pliers, alcohol was flushed into his eyes and nose, and other fluids were forced in his anal passage. Electrodes were attached to his earlobes, toes, and genitals, and electricity was shot throughout his body, leaving him unconscious for periods of time.

Throughout this period, Toscanino asserted, the United States government and the United States Attorney for the Eastern District of New York were aware of the interrogation and received reports of its progress. Moreover, a member of the Bureau of Narcotics and Dangerous Drugs of the Department of Justice was present at times, and actually participated in some of the interrogation.

Eventually, Toscanino claimed, he was drugged and flown to New York. He awakened when the aircraft reached the United States. Upon landing and while still aboard he was arrested. The district court never held a hearing with respect to Toscanino's allegations.

On appeal from his conviction, the Court found that Toscanino had alleged a violation of due process which, if proven, would require the trial court to dismiss the case. Yet in holding that the *Ker-Frisbie* rule was not intended to give government agents a carte blanche in bringing home defendants from abroad by use of torture, brutality or

other outrageous conduct, the Court did not intend to suggest that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would result in a dismissal of the indictment and a discharge from custody. United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2nd Cir., 1975); United States v. Herrera, 504 F.2d 859 (5th Cir., 1974).

In *Lujan, supra,* the Second Circuit carefully distinguished the ramifications of its holding in Toscanino stating:

> "In sum, but for the charge that the law was violated during the process of transporting him to the United States, Lujan charges no deprivation greater than that which he would have endured through lawful extradition. We scarcely intend to convey approval of illegal government conduct. But we are forced to recognize that, absent a set of incidents like that in Toscanino, not every violation by prosecution or police is so egregious that Rochin and its progeny requires nullification of the indictment."

And further, as Judge Anderson stated in concurring:

> ". . . Judge Kaufman has correctly, it seems to me, noted and applied the thrust of the action of the majority of this court in denying an en banc hearing in Toscanino to the effect that whenever a foreign national is abducted or kidnapped from outside of the United States and is forcibly brought into this Country by United States agents by means of torture, brutality or similar physical abuse the federal court acquires no jurisdiction over him because of a violation of due process. *Otherwise the holdings of the Supreme Court in* Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), *and* Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952) *govern.* (Emphasis added.)

■ This Court is also of the opinion that the *Ker-Frisbie* rule is still the appropriate test to be applied in evaluating the question of a Court's jurisdiction over defendants who have been returned to the United States against their will. The *Toscanino* decision is only applicable in those cases that present an egregious factual situation involving torture, brutality, or, some form of an official protest to the violation of an extradition treaty by a foreign government. None of those factors are present in the instant case. The defendants' return to the United States resulted from the efforts of Supt. Tricker. Furthermore, even if Supt. Tricker had acted illegally under Grand Cayman law in returning the defendants to the United States, that would not affect the jurisdiction of this Court. This Court has no authority nor desire to rule upon the propriety of Supt. Tricker's actions. Yet the dictates of good common sense show that Supt. Tricker acted in a reasonable, intelligent, and concise fashion in returning the defendants to the United States. The actions he took, and the involvement of the F.B.I. agents, simply cannot be compared to the facts in the Toscanino case. The cases are inapposite.

## THE FACT THAT AN EXTRADITION TREATY EXISTED BETWEEN THE UNITED STATES AND GREAT BRITAIN DOES NOT AFFECT DEFENDANTS' STATUS BEFORE THIS COURT.

■ Defendants argue that the United States did not comply with the British-American extradition treaty which requires that extradition shall take place only if the evidence be found sufficient, according to the laws of the country applied to, in order to justify the committal of the prisoner for trial. They assert further: "[t]he United States chose not to present any evidence to British authorities, and instead abducted defendants without following the mandate of the treaty."

Defendants, in their rush to argue the law of extradition, look at the facts only with a jaundiced eye. Despite hours of cross-examination by defense counsel at the hearing the only evidence this Court heard was of Supt. Tricker's efforts to

return the defendants to the United States. There simply was no abduction or kidnapping by American agents. Even if the agents had sought to return the defendants to the United States in violation of the treaty, it is very unlikely that Supt. Tricker would have permitted such conduct. He was running the show, and, like a true British gentleman that he appears to be, "everything was to be done properly".

The cases cited by the defendants, United States v. Ferris, 19 F.2d 925 (N.D.Cal.1927); Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); United States v. Schouweiler, 19 F.2d 387 (S.D.Cal.1927), all involve occasions wherein the government took some type of affirmative action to secure the arrest and return of the defendants. Yet in the case at bar this Court need not concern itself with this question because no evidence has been presented that agents for the government took action in violation of the extradition treaty.

## DEFENDANTS' MOTION TO SUPPRESS EVIDENCE IS WITHOUT LEGAL AUTHORITY.

The defendants have moved to suppress "cash and other objects seized from the defendant[s] . . . at the time of [their] arrest; any testimony relating to the circumstances of the arrest . . .; and any currency or other objects seized from any bank or safe-deposit box in Grand Cayman, British West Indies;" on the alleged grounds that: (1) the $26,000 in case seized from the defendants cannot be proved to be the fruits of a crime; (2) the defendants' arrest was a pretext and without probable cause; (3) the return of the defendants to the United States was unlawful; and (4) the seizures made at banks or safe-deposit boxes in Grand Cayman violated international law and the United States Constitution.

■■■ The first ground raised by the defendants is not the proper subject of a motion to suppress. Whether the gov-

ernment can lay an adequate foundation for the admission of such evidence is governed by the rules of evidence. A ruling on its admission must await the offer, at which time the court can determine the adequacy of the foundation and the relevance of the evidence in light of the other evidence in the case. On the other hand, extraterritorial application of the exclusionary rule is determined by an examination of the purpose for which the rule was fashioned, that is, to curb unlawful conduct of law enforcement officers by suppressing the fruits of that conduct. Therefore, the rule does not apply to evidence seized in a foreign country by foreign agents unless the conduct which produced the evidence was in violation of the United States Constitution and United States agents substantially participated in the conduct. United States v. Tierney, 448 F.2d 37 (9th Cir. 1971); United States v. Shea, 436 F.2d 740 (9th Cir. 1970); Stonehill v. United States, 405 F.2d 738 (9th Cir. 1968), cert. denied 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); Brulay v. United States, 383 F.2d 345 (9th Cir. 1967), cert. denied, 389 U.S. 986, 88 S. Ct. 469, 19 L.Ed.2d 478 (1968).

United States v. Shea, *supra,* and United States v. Tierney, *supra,* involved the same facts. Brazilian agents searched Tierney's room after he and Shea had been arrested. Evidence seized was introduced against them at a trial in the United States. In *Shea* the court stated:

"[A]side from the question of standing, we hold that the record before us supports the finding of the trial judge that the arrest and search were made by Brazilian authorities and that there was no substantial American participation. Consequently, the motion to suppress was denied.

\* \* \*

The mere fact that an official of the American Embassy in Brazil may have known of proposed action by the Brazilian police did not place on the appellee the burden of showing no participation by American authorities

in the Brazilian arrest or search." United States v. Shea, *supra*, at 741.

In *Tierney* the court added:

> "The public policy behind the exclusion of evidence found inadmissible under this country's search and seizure laws does not extend to the education of foreign police, or officers of another sovereign state, in their searches within their own jurisdiction." United States v. Tierney, *supra*, at 39.

Brulay v. United States, *supra*, involved the seizure of amphetamines by Mexican authorities. The court found that no United States officer participated in questioning the defendant at or prior to the time of the seizure, and "although the customs agents of the United States had alerted Mexican federal police to the defendant's activities, the Tijuana municipal policemen who made the seizure were not acting at the instigation of United States customs or narcotic officials." In ruling the evidence admissible, the court stated:

> "The Fourth Amendment is directed at the Federal Government and its agencies. Fourth Amendment rights are protected from state encroachments by the Fourteenth Amendment which reaches the states and their agencies. The Fourth Amendment does not, by its language, require the exclusion of evidence and the exclusionary rule announced in *Weeks* is a court-created prophylaxis designed to deter federal officers from violating the Fourth Amendment. Neither the Fourth nor the Fourteenth Amendments are directed at Mexican officials and no prophylactic purpose is served by applying an exclusionary rule here since what we do will not alter the search policies of the sovereign Nation of Mexico." Brulay v. United States, *supra*, at 348 (footnotes omitted).

Accordingly, it is hereby ordered that defendants' motions for the Court to discharge them from custody and to suppress certain evidence are both denied.