**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Armando BENITEZ,**
**Defendant-Appellant.**

**No. 83–5551**
**Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 17, 1984.

As Amended on Denial of Rehearing
and Rehearing En Banc
Dec. 5, 1984.

Stephen J. Finta,. Fort Lauderdale, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Joseph R. Buchanan, Linda Collins-Hertz, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before HILL, KRAVITCH and HATCHETT, Circuit Judges.

JAMES C. HILL, Circuit Judge:

Armando Benitez was tried and convicted in the United States District Court for the Southern District of Florida on charges of conspiring to murder Drug Enforcement Administration (DEA) agents engaged in the performance of their official duties, 18 U.S.C. §§ 1114 & 1117; assaulting a DEA agent (Charles Martinez) with a deadly weapon while he was performing official duties, 18 U.S.C. §§ 111 & 2; assaulting another DEA agent (Kelly McCullough) with a deadly weapon while he was performing his official duties, *id.;* robbing agent Martinez of his official United States government passport and DEA credentials, 18 U.S.C. §§ 2112 & 2; and robbing Agent McCullough of his official United States government passport and DEA credentials, *id.* Following a trial, a jury found Benitez guilty on all five counts. Benitez appeals to this court, requesting that we set aside his conviction. We affirm.

## I. THE EVENTS IN COLOMBIA

On February 2, 1982, DEA special agents Kelly McCullough and Charles Martinez journeyed to Colombia to participate in an operation known as Tiburon. To implement Tiburon, McCullough and Martinez intended to fly airplanes from Colombian airfields to identify and photograph ships possibly carrying drugs. The agents would then forward the information they had obtained to the appropriate United States authorities. Martinez and McCullough entered Colombia carrying official United States government passports; the Colombian government knew of and approved their presence in Colombia.

Martinez and McCullough checked into adjoining rooms at the Don Blas Hotel in Cartagena, Colombia. On February 5, 1982, DEA Special Agent Johnny Phelps, Special Agent in charge at the U.S. Embassy at Bogota, requested that Martinez and McCullough determine whether Rene Benitez, a fugitive from American justice, was also staying at the Don Blas.

On February 7, 1982, Martinez went to the office of the hotel manager where he spoke with a man named Mr. Lazaro. Martinez identified himself as a DEA agent and requested information concerning Rene Benitez' whereabouts. Martinez displayed his DEA identification and official United States passport and informed Lazaro that he was staying in room 1804. Lazaro promised to review the hotel records and call Martinez, but he did not do so.

On February 8, 1982, Martinez called Lazaro and asked him whether he had located Benitez. Lazaro responded that he had

been unable to review the records, but that he would do so and call Martinez. On February 9, 1982, Martinez again went to the manager's office and asked to speak to the manager. Martinez then discovered that Lazaro was not the manager. Martinez identified himself to the manager, again displaying his official United States passport and DEA credentials. Martinez asked if Rene Benitez was staying in the hotel. The manager promised to call him within the hour, but did not do so. Martinez and McCullough abandoned any hope of receiving cooperation from the hotel management and went to dinner. When they returned from dinner at 9:00 p.m., the hotel manager had not left them a message.

At 9:30 p.m., Martinez heard a knock on the door of room 1804. Martinez answered the door and discovered a young woman in a maid's uniform who informed him that she was there to turn down the bed and open the blinds. Martinez declined her offer and watched as she walked down the hall, not knocking at any other doors. Martinez, who realized that the woman was not the regular maid whom he had previously seen on duty, contacted McCullough and informed him of the suspicious event.

At 12:30 a.m., both Martinez and McCullough were awakened by a loud banging on the door of room 1804. McCullough entered room 1804 through the adjoining door and asked who was at the door. The reply in Spanish was "Police! Open the door." Martinez went to the door of 1803, opened it, and looked down the hall. He saw four men standing in front of Room 1804; two had guns drawn. When they saw Martinez, they ran to the door of room 1803, but Martinez quickly closed and locked it.

Martinez asked to see the men's identification. A man's voice, later identified as that of Jose Ivan Duarte, said that he wanted to speak to Martinez concerning his questions to Lazaro. A man's voice, later identified as that of Rene Benitez, said "open the door or we will shoot it down." Martinez tried to call the police, but the hotel operator refused to place the call.

She agreed to send up hotel security. At that point, Duarte slid his Colombian National Police identification card under the door. Martinez slid his official passport under the door and said he was assigned to the United States Embassy in Bogota. Hotel security then knocked on the door of room 1803 and informed Martinez and McCullough that the men outside were police officers. Martinez opened the door. Duarte dismissed hotel security and entered the room carrying a pistol, accompanied by Armando Benitez, Rene Benitez, and Jairo Valencia.

Duarte grabbed Martinez' arm and led him into room 1804. Duarte asked Martinez his name. Rene Benitez then walked in holding a cocked pistol and said, "I am Rene Benitez. Why are you looking for me?" Martinez repeated that he was with the Embassy and was trying to locate Rene Benitez at the hotel. Duarte then told Martinez to get dressed because they were going to the police station for more questions. Armando Benitez then walked in and again ordered Martinez to get dressed. Armando Benitez, Duarte, and Rene Benitez then searched room 1804.

While the four Colombians questioned Martinez in room 1804, McCullough was kept in room 1803. Rene Benitez searched McCullough for weapons at gunpoint, and Armando Benitez searched McCullough's personal effects, taking McCullough's DEA credentials, official passport and personal passport. Duarte, Rene, and Armando inspected the credentials. Armando said, "These are the guys. They are both DEA agents." Martinez asked to call the American Embassy. Rene replied, "you are not going to call the Embassy." Rene pointed his cocked pistol at Martinez' head and stated, "this is the only law in Colombia."

The four Colombians removed Martinez and McCullough from room 1803 at gunpoint, led them to the elevators, and removed them through the lobby of the hotel. Rene Benitez directed Martinez and McCullough to get into a car waiting at the curb. McCullough entered the left rear seat with Valencia next to him. Durate drove, and

Rene Benitez sat in the front passenger seat, with Martinez on the hump between Duarte and Rene. Armando Benitez did not enter the car, and the agents did not see him again that evening.

As Rene Benitez held his gun on Martinez, Duarte drove the car north, out of Cartagena and through an isolated rural area. Valencia told McCullough that they were going to the police station. Rene Benitez asked Martinez what he was doing in Colombia. Martinez said he was assigned to the United States Embassy as a pilot, obtaining information on ships smuggling marijuana. Rene then informed Martinez that he did not appreciate Americans coming down and getting into their marijuana business. To make sure that Martinez got the message, Rene shot him in the right hip. The impact of the gun's discharge knocked the car out of gear, and it coasted to a stop. Martinez asked to go to the hospital. Duarte and Rene assured him that they were taking him to a hospital immediately. The car then passed a hospital in the village of Turbaco, but did not stop.

Three miles past Turbaco, Duarte stopped the car alongside a wooded area. He informed the agents that the "other guys" were following in a second car. Rene Benitez, Duarte, and Valencia got out of the car. Rene Benitez motioned with his gun for Martinez to get out of the car. While Rene and Duarte argued over whether to leave the agents in the car, Martinez told McCullough, "they are going to kill us." Martinez found it difficult to get out of the car, but managed to stand up, supporting himself by holding on to the car. Seeing Rene's gun pointed at his head, he fell back on the seat. Rene shot him in the shoulder. Rene pulled the trigger again, but the gun did not fire. Martinez gathered his strength and rushed Rene, whose gun again misfired. Martinez tried to grab Rene, who hit him with the gun and knocked him down. Martinez managed to get up and run away.

McCullough managed to push his way out of the back seat when Rene shot Mar-

tinez. McCullough tried and failed to grab Duarte's gun and then ran away. Three shots fired at him missed. McCullough ran into a ditch alongside the road, fell down and got up. A bullet then struck the inside of McCullough's knee as another entered his hip. He fell. Duarte stood over him and shot him in the neck. McCullough waited for another shot, but the shot never came.

Martinez hid in the woods overnight, and, after the sun rose, he made his way to the road. He stopped a vehicle that drove him to the Colombian naval hospital in Cartagena. When McCullough realized that he was alive, he ran down the road, hiding whenever a car came by. He saw the Colombians' car go by. Eventually, he reached a church in Turbaco and persuaded the priest, who spoke English, to return with him and look for Martinez. The priest also brought a doctor and a policeman. When they arrived at the scene of the crime, McCullough saw Rene Benitez and another unidentified person from the hotel room walking toward him down the road. Rene reached for his gun, but the policeman grabbed Rene. The policeman did not disarm Rene, however, but informed McCullough that it was time to return to Turbaco. McCullough returned to Turbaco, took a bus to Cartagena, and was airlifted that night, along with Martinez, to the United States Military Hospital in Panama.

## II. ISSUES PRESENTED

 Of the issues raised by Benitez, several do not merit discussion. Benitez' claim of ineffective assistance of counsel will not be considered on direct appeal. *See, e.g., United States v. Griffin,* 699 F.2d 1102, 1107 (11th Cir.1983). Benitez' contention that the district court incorrectly excluded expert testimony concerning identification also lacks merit because such testimony is not admissible in this circuit. *See United States v. Thevis,* 665 F.2d 616, 641 (5th Cir. Unit B 1982), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). Benitez contends that the district court im-

properly admitted coconspirator Rene Benitez' statement that, "I don't like you Americans coming down here and messing around in our marijuana business." This contention also lacks merit; the statement was properly admitted under Rule 801(d)(2)(E) of the Federal Rules of Evidence as a statement of a coconspirator. Benitez' contention that the district court should not have admitted the identification testimony of agents Martinez and McCullough also lacks merit. Although Agent McCullough identified Benitez at a lineup in Colombia, the district court found that the identification procedures were not unnecessarily suggestive. In addition, applying the five factors enumerated in *Neal v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 112–13, 97 S.Ct. 2243, 2252, 53 L.Ed.2d 140 (1977), the district court concluded that the totality of the circumstances indicated the agent's testimony to be reliable. Finally, despite Benitez' unsupported contentions, this is not a case in which he was unable to receive a fair trial before a jury (and thus would be entitled to a bench trial). *See Singer v. United States*, 380 U.S. 24, 37, 85 S.Ct. 783, 791, 13 L.Ed.2d 630 (1965).

### A. *Jurisdiction to Try Benitez.*

■ Benitez argues that the district court had no jurisdiction to try him because he is not a United States citizen and the acts from which the charges stem occurred in Colombia. In resolving this issue, it is important that the crimes for which Benitez has been convicted were assault upon United States DEA agents, attempted murder of United States DEA agents, and theft of United States government property. Given the nature of the offenses and the identity of the victims, we conclude that the district court had jurisdiction to try and convict Benitez.

In *Rivard v. United States*, 375 F.2d 882 (5th Cir.), *cert. denied*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967), the court set forth the principles governing assertion of jurisdiction in this type of case:

Under international law a state does not have jurisdiction to enforce a rule of law prescribed by it, unless it has jurisdiction to prescribe the rule. Restatement, Second, Foreign Relations Law of the United States § 7(2).

It is for this reason that the mere physical presence of the four alien appellants before the court did not give the district court jurisdiction. The question remains whether their conduct without the United States had such a deleterious effect within the United States to justify this country in prohibiting the conduct. Restatement, Second, supra § 18.

The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles. They are the territorial, national, protective, universality, and passive personality principles. *Rocha v. United States*, 9 Cir., 1961, 288 F.2d 545; *cert. den.* 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 . . . .

375 F.2d at 885 (footnotes omitted).

Two of the principles enumerated in *Rivard* are applicable in this case—the protective principle and the passive personality principle. Under the former, jurisdiction is based on whether the national interest is injured; under the latter, jurisdiction is based on the nationality or national character of the victim. *See also United States v. Layton*, 509 F.Supp. 212 (N.D.Cal.1981). We have no doubt that jurisdiction exists in this case under these principles. Under the protective principle, the crime certainly had a potentially adverse effect upon the security or governmental functions of the nation. *See United States v. Pizzarusso*, 388 F.2d 8, 10–11 (2d Cir.), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); *Marin v. United States*, 352 F.2d 174 (5th Cir.1965). Furthermore, the nationality of the victims, who are also United States government agents, clearly supports jurisdiction.

Benitez contends that, even if the United States can properly assert jurisdiction over him in this case, the Congress chose not to do so under the statutes he is charged with violating. It is true that a presumption

against extraterritorial application of a statute is often said to apply. *See United States v. Cotten,* 471 F.2d 744, 750 (9th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973). Nevertheless, there is every indication in this case that Congress intended the statutes in question to have extraterritorial application. As the court stated in *Cotten* when deciding whether Congress intended that the statute prohibiting theft of government property should apply extraterritorially, "[i]t is inconceivable that Congress ... would proscribe only theft of government property located within the territorial boundaries of the nation." *Id.* Our conclusion in this case with regard to the theft of the agents' passports and credentials is the same. In addition, we hold that assault and attempted murder of DEA agents is exactly the type of crime that Congress must have intended to apply extraterritorially. *See Layton,* 509 F.Supp. at 217 (applying extraterritorially section 351 of the criminal code, which prohibits murder of a member of Congress).[1] Thus, the district court had the power to apply United States law in this situation.

### B. *Sufficiency of the Evidence.*

■ Benitez next argues that the evidence introduced at trial was insufficient to support his convictions. Considering this challenge, we must view all the evidence, together with all logical inferences flowing from the evidence, in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). All credibility choices must be drawn in favor of the finder of fact. *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1982). Under these standards, we must decide whether "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." The evidence does not have to exclude every reasonable hypothesis of innocence. *United States v. Bell,* 678 F.2d 547 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

■ Benitez argues that he was a mere bystander to the events in Colombia. The presence of the defendant, although it is not sufficient alone to support a conviction, is not inconsequential. *See United States v. Kincade,* 714 F.2d 1064, 1065 (11th Cir. 1983). In this case, however, the "mere presence" doctrine is hardly involved. We have recited the facts of this case, established by the evidence, above. Benitez, accompanied by the other three Colombians, entered the agents' hotel rooms at gunpoint. Benitez searched the agents' belongings and found their official passports and DEA identification. Benitez was the last person seen with these documents, which are still missing. Benitez was an active participant in all of the illegal activi-

---

1. The United States Supreme Court in *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922), set forth the analysis applicable in this case as follows:

> The necessary locus [for application of a statute] when not specifically defined, depends upon the purpose of Congress as evinced by the description and nature of the crime, and upon the territorial limitations upon the power and jurisdiction of the government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds which affect the peace and good order of the community, must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it

is natural for Congress to say so in the statute....

> But the same rule of interpretation should not be applied to criminal statutes, which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. ... in such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

260 U.S. at 97–98, 43 S.Ct. at 41. In *Bowman,* the Supreme Court held that a law of the United States prohibiting presentment of false claims to the government or its officers had extraterritorial application.

ty in the agents' hotel rooms, searching for and seizing the documents, identifying the agents as those sought by the conspirators, and actively participating in the kidnapping. The government certainly produced sufficient evidence to support the assault and robbery convictions.

 Benitez contends that there was no evidence to prove that he knew that the other Colombians intended to assault and attempt to murder the agents. He characterizes such a conclusion as "pure conjecture." We disagree. There was sufficient evidence at trial from which the jury could conclude that Benitez knew the object of the conspiracy. Benitez and his cohorts presented themselves as police officers and indicated to the agents that they were going to be taken to the police station. He was present when Rene told Martinez, "You are not going to call the Embassy. This [his gun] is the only law in Colombia." He aided the other Colombians in removing the agents from the room; requiring them to exit the hotel onto the street where the car was parked. His departure before the agents were actually forced into the automobile to commence the death ride is his asserted defense. He argues that the object of the conspiracy changed after he departed; therefore, he should not be held responsible for the acts of his coconspirators. In this case, however, there is no indication that the object of the conspiracy changed. Nothing intervened to cause the ride in the country to end with pistol shots. The agents did not provoke the Colombians by insulting or striking them before Rene shot Martinez. The ride started, proceeded to a secluded area, and stopped. The agents were ordered out of the car and shot.

When he took the stand, Benitez took the risk that he might bolster the government's case. *See United States v. Contreras,* 667 F.2d 976, 980 (11th Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982). Benitez testified that he was not present in the hotel rooms with the agents and the other Colombians. The evidence entitled the jury to find that Benitez was present at the start of a chain of events that led directly to the attempted murder of the agents. Instead of testifying that he did not realize that this was the purpose of the conspiracy, Benitez contended that he was not at all present. The jury obviously discredited Benitez' explanation.

We hold that the above evidence was sufficient for the jury to conclude that Benitez was a member of the conspiracy and knew its objectives. *See United States v. Vera,* 701 F.2d 1349 (11th Cir.1983). Indeed, the credible evidence belies Benitez' contention that he was a mere bystander.

C. *Proposed Jury Instruction.*

 Benitez requested that the trial court instruct the jury as to the law concerning the scope of the conspiracy and the "mere association" rule. Benitez also requested that the trial court instruct the jury that he could not be found guilty of conspiring to murder agents McCullough and Martinez unless the government proved that he knew the agents were in Colombia on official United States business. As to the first two requests, the trial court properly instructed the jury on these issues even though it did not adopt Benitez' suggested instructions. As to the second request, the trial court properly refused to give the instruction because it misstated the law. Benitez could be convicted of conspiring to murder government agents even if he did not know they were government agents. *See United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

The judgment of the district court is AFFIRMED.