**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ralph MARRERA, Defendant-Appellant.**

**No. 83–1711, 84–1692.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1985.

Decided July 25, 1985.

Rehearing and Rehearing En Banc
Denied Aug. 26, 1985.

Frederick F. Cohn, Chicago, Ill., for plaintiff-appellee.

Lawrence Rosenthal, Asst. U.S. Atty., Chicago, Ill., for defendant-appellant.

Before WOOD and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant Marrera's guilt is clear, but so is his trial counsel's serious breach of ethics which created at least a potential conflict of interest. The impact of counsel's ethical breach on his representation of Marrera and on the jury's guilty verdict is the principal issue.

Defendant and his conspiring friends made off one October weekend in 1974 with 4.3 million dollars from the vault of Purolator Services, Inc. The government calls it a spectacular robbery; perhaps, but in some respects it was an amateurish caper for it left the defendant, the only Purolator employee on duty at the time of the robbery, looking very suspicious. The suspicions quickly developed into evidence and the defendant and his friends were indicted for conspiracy,[1] and various other bank robbery related charges.[2] Marrera's case was severed for trial.[3]

---

1. 18 U.S.C.A. § 371 (West 1969), conspiracy to rob a bank.

2. 18 U.S.C.A. § 2113(b) (West 1984), bank robbery.

18 U.S.C.A. § 2113(a) (West 1984), entry into a bank with intent to steal its deposits (dismissed prior to trial).

3. See note 3 on page 203.

Marrera's retained counsel also perceived it as a spectacular caper, one worthy of Hollywood. So, before trial, Marrera and his counsel took it to Hollywood, agreeing to share equally in the anticipated good fortune resulting from Marrera's otherwise bad fortune. After trial and his sentencing to twenty years on the various counts, Marrera filed a direct appeal raising evidentiary questions; subsequently he filed a habeas corpus petition alleging that he had been denied his constitutional right to effective assistance of counsel because of his attorney's Hollywood conflict of interest. We consolidated the direct and collateral attacks. Before reaching the legal issues, we examine a few highlights of the story.

## I.

Purolator provides armored car and storage security services for a number of federally insured banks in the Chicago area and the Hawthorne Racetrack. Part of that service involves picking up its customer banks' money as agent and storing it overnight or over a weekend in its vaults pending deposit in the designated bank. While in Purolator vaults, which are protected by an alarm system, the money is stored in separate sealed containers. On weekends the vaults are closed Saturday evenings and not opened until Monday morning. While the vaults are closed, only two persons are regularly on duty, an alarm operator and a vault guard.

On the weekend of the robbery Marrera was on duty as vault guard with responsibility for monitoring all building entrances, which are kept locked, and for acting as temporary custodian for the personal effects of any person entering the vault area. The alarm operator that weekend was Angela Hughes. Early on Sunday evening, shortly after receiving a phone call, Marrera suggested to Ms. Hughes that she leave early. Ms. Hughes left four hours early, around 8:00 P.M. Her shift replacement did not arrive until midnight.

Shortly after the relief alarm operator arrived, Marrera telephoned the Purolator manager to report a fire in one of the two vaults. The manager and firemen arrived soon thereafter and opened the vault. The fire had not destroyed everything in the vault, apparently because of insufficient oxygen in the closed vault. The money containers, coins, and some currency were strewn about. Also remaining were the residue of a flare and a few plastic containers of gasoline, but $4.3 million was gone. The padlocked container in which Hawthorne's proceeds[4] had been stored was found open and empty except for one of the unignited plastic bags of gasoline. The entrance to the building had not been forced. The vault had not been forced. The padlock on the Hawthorne money box had not been forced. The circumstances suggested an inside job and Marrera was the only person present for a period of several hours prior to his report of the fire.

Other evidence also pointed to Marrera. On several weekends prior to the robbery weekend, when Marrera was on duty, there had been vault fire false alarms, now viewed as burglary experiments. Not long before the robbery Marrera had asked another employee whether the stored currency was marked and what the money containers weighed. He then tried to lift one. Additionally, Marrera, as vault guard, had access to the Hawthorne padlock number which was enough to have a duplicate key made. The words and deeds of Marrera's outside co-conspirators also pointed to

18 U.S.C.A. § 844(h)(1) (West 1976), use of an explosive device in order to steal the money of a bank.
18 U.S.C.A. § 844(i) (West 1976), use of an explosive device to damage or destroy property.
18 U.S.C.A. § 2314 (West 1970), transportation of stolen money in foreign commerce.

**3.** For the details of the trial and convictions of Marrera's cohorts see *United States v. Marzano,* 388 F.Supp. 906 (N.D.Ill.1975), *aff'd,* 537 F.2d 257 (7th Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977).

**4.** The theft of the Hawthorne money is not charged as no federal insurance is involved, but is used in the case for its evidentiary value.

Marrera. They told an undercover agent about their plans for a "big score," and sought to enlist the agent's help in acquiring a van for the purpose. They in fact did acquire a van and Marrera was seen riding in it. After the robbery the van was recovered and contained evidence suggesting that it had been used to haul the loot. Later, when arrested, one of the co-conspirators, Charles Marzano, was found with some of Hawthorne's money in his pocket. Marrera was also implicated by the discovery of a fresh concrete vault filled with Hawthorne money in his grandmother's vacant house. Before the robbery witnesses saw two men hauling sacks of concrete into the house and dirt out. The fingerprints of one of the co-conspirators was found on a Hawthorne bill in Marrera's grandmother's basement.

Marrera's own statements provided the final evidence of guilt. In an interview with the FBI on the day following the robbery, he denied knowing Charles Marzano. Later, after becoming aware that he had been seen in the van with Marzano before the robbery, he recanted, admitting that he knew Marzano, a professional burglar with whom he had been regularly having lunch. Marrera also admitted that he had used the van to deliver some plyboard to one of the other conspirators. Plyboard was used in the basement vault. Marrera also admitted knowing another of his co-conspirators, an alarm and security system expert and no doubt a valuable member of the team. Marrera admitted giving Hughes, the only other employee present on the night of the robbery, permission to leave early even though he knew in so doing he risked losing his job.

In a subsequent interrogation, however, Marrera assumed a more uncooperative attitude and advised Chicago police, "If you have enough evidence, charge me, then convict me. This is the biggest score ever. I will take twenty or thirty years, go to the joint, write a book and make another million." Marrera was as impressed as the government with what he and his friends had accomplished. Indictment followed. Marrera did get the twenty years he had suggested, but as far as we know he has not yet written his book.

II.

After indictment but prior to trial, Marrera's trial counsel, Morton L. Zaslavsky, appeared before the district judge to obtain a modification in the terms of Marrera's bond so that his client could travel with him outside the district to California. Counsel did not disclose any fee arrangement he had with Marrera which Marrera alleges was a thousand-dollar retainer plus fifty percent of any proceeds obtained from the sale of the movie rights to the Purolator story. In modifying the terms of the bond the trial judge nevertheless clearly cautioned counsel about the possible ethical problems.[5] Counsel and Marrera went to Hollywood together.

The Hollywood trip developed at trial in this way: During cross-examination the government asked Marrera about his statement to police that he would write a book and make "another million." He admitted the statement, but endeavored to explain it

---

5. The relevant ethical standards are explicit:

> It is unprofessional for a lawyer, prior to the conclusion of all aspects of the matter giving rise to his or her employment, to enter into any agreement or understanding with a client or prospective client by which the lawyer acquires an interest in publication rights with respect to the subject matter of the employment or proposed employment.

ABA Standards for Criminal Justice Standard 4–3.4 (2d ed. 1980).

> Prior to the conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client by which he acquires any interest in publication rights with respect to the subject matter of his employment or proposed employment.

ABA Model Code of Professional Responsibility DR 5–104(B) (1980).

> Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation.

ABA Model Rules of Professional Conduct Rule 1.8(d) (1983).

away by emphasizing the difficult circumstances surrounding the conversation. When asked whether he actually intended to write a book, Marrera responded that he neither read books nor went to movies. Government counsel then moved to the Hollywood trip. Marrera admitted making the trip and meeting with several movie producers, but stated that he told his counsel he wanted nothing to do with a movie, only to go home. He was then questioned about conversations with several specific producers and in particular whether he had told one of the producers that he knew all the individuals involved in the theft. Before Marrera answered the question, his counsel interrupted, saying that Marrera had said nothing of that kind, that counsel had been present too, and that he would testify to that. The trial judge struck counsel's statement. Government counsel then pursued the same line of questioning about what Marrera had said to specific producers, including whether he told one producer that he would not tell the producer the details of the theft until his trial was over.

On redirect Marrera's counsel went back over the book-writing conversation with the police and then briefly the California trip. His counsel's leading questions suggested that one of the producers mentioned during the government's cross-examination was a personal friend of Marrera's counsel and that the meeting was in the hopes that the producers would be interested in making a movie. Marrera again stated he only told the producer that he did not want a movie, to forget it all. The examination of Marrera concluded, and again Marrera's counsel asked for the opportunity to testify. The judge denied the request, and directed the jury to disregard the attorney's improper request. The judge then explained that lawyers do not testify in cases they are trying. The presentation of evidence concluded soon thereafter. The trial judge, outside the presence of the jury, asked the government if it was prepared to offer foundation evidence about the movie producer conversations it suggested in its cross-examination of Marrera had occurred.

The government explained that its questions were based on FBI interviews with producers and that it was not prepared to call the producers because it had not been anticipated that Marrera would deny the conversations. The judge denied the government additional time to try to arrange for the Hollywood witnesses. The judge permitted the evidence that there was a trip to Hollywood to stand, but struck all the evidence relating to what may have been said to the producers in Hollywood. When the jury returned, the judge, in a comprehensive statement and instruction, explained to the jury the impropriety of the government's questions about specific conversations with the producers, called it unfair, and instructed the jury to disregard these questions.

### III.

We must now determine what these Hollywood events amount to as a legal matter. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In most ineffective assistance cases, the defendant has the burden of affirmatively proving prejudice. Where, however, an alleged conflict of interest predicates the ineffectiveness claim the defendant bears a lighter burden. That is, where a defendant puts a trial judge on notice of the alleged conflict before or during trial and the trial court fails to inquire into the conflict, a reviewing court will presume prejudice upon a showing of possible prejudice; *Holloway v. Arkansas*, 435 U.S. 475, 484–91, 98 S.Ct. 1173, 1178–82, 55 L.Ed.2d 426 (1978); *Cuyler v. Sullivan*, 446 U.S. 335, 345, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); on the other hand, if the defendant fails to put the trial court on notice of the alleged conflict, a

reviewing court will presume prejudice upon a showing that the potential conflict developed into an actual conflict which adversely affected the defense lawyer's performance. *Id.* at 348–50, 100 S.Ct. at 1718.

Marrera predicates his ineffective assistance claim on an alleged conflict of interest between his lawyer's financial interest in proceeds from the movie rights and Marrera's interest in acquittal. To decide whether to apply the *Holloway* test and afford defendant a per se presumption of prejudice or to apply the *Cuyler* test and grant the presumption of prejudice only upon a showing of actual conflict and adverse effect on counsel's performance, we must first determine whether the defendant put the trial judge on notice of the alleged conflict. Marrera argues that his counsel put the judge on notice when he appeared before the judge seeking the modification in the terms of Marrera's bond to allow Marrera to go with counsel to Hollywood. At the bond modification hearing, Marrera's counsel told the judge the purpose of the trip but did not disclose the fee arrangement. The judge warned defense counsel of the potential conflict problem. Counsel responded, "I see."

The question is whether the trial judge fulfilled his duty in warning counsel regarding the potential conflict or whether he should have inquired further regarding the relationship between the counsel and defendant. We think that under the circumstances the judge fulfilled his duty and that if anyone is to blame for the predicament in which Marrera found himself at trial when references were made to the trip it is Marrera and his counsel. In *Cuyler* the Supreme Court noted that "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.... [T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel." 446 U.S. at 346–47, 100 S.Ct. at 1716 (footnote omitted). The *Cuyler* Court went on to explain that the defense counsel " ' "is in the best position professionally and ethically to determine when conflict of interest exists or will probably develop in the course of a trial." ' " *Id.* at 347, 100 S.Ct. at 1717 (quoting *Holloway v. Arkansas,* 435 U.S. at 485, 98 S.Ct. at 1179 and *State v. Davis,* 110 Ariz. 29, 31, 514 P.2d 1025 (1973)); *see also United States ex rel. Ballard v. Bengston,* 702 F.2d 656, 662 n. 6 (7th Cir.1983) (defense attorneys have the primary responsibility for the ascertainment and avoidance of conflicts of interest); *United States v. Medina-Herrera,* 606 F.2d 770, 776 (7th Cir. 1979) (to same effect), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980).

The trial judge gave Marrera's counsel forewarning of the potential conflict and thereafter reasonably relied on defense counsel to bring to the court's attention any conflict that might arise during the course of his representation. After being warned of the possible conflict, defense counsel said, "I see." We view this statement as an implicit assurance to the court that counsel understood the potential problem and assumed the responsibility for bringing any conflict to the judge's attention if and when one developed. Counsel never mentioned the conflict problem again. The judge did not neglect his duty in not inquiring further into the potential conflict problem. *See Cuyler,* 446 U.S. at 346–48, 100 S.Ct. at 1717–18 ("Absent special circumstances, ... trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.").

Moreover, in this case the defendant himself shares the blame with his lawyer for failing to raise the conflict issue with the judge. Whereas in dual representation cases it cannot be assumed that a defendant is as well positioned as the lawyer to know all the ways in which his defense may conflict with another defendant's, here Marrera knew about his lawyer's financial interest in the movie rights and knew or should have known that taking the trip could jeopardize his defense. Marrera willingly entered the fee arrangement with his

lawyer and willingly took the trip; to that extent Marrera and his counsel were in complete agreement, not conflict. Marrera must therefore share with his attorney the blame for any harm that he alleges the trip caused his defense.

■ Since we hold that the judge was not put on notice of an actual conflict and fulfilled his duty in warning counsel of the possibility for conflict, we apply the *Cuyler* test, that is, we inquire whether the potential conflict ever developed into an actual conflict which adversely affected defense counsel's performance.[6] If so we will presume prejudice and grant a new trial.

■ The first inquiry under the *Cuyler* test is whether the potential conflict ever developed into an actual conflict requiring the defense attorney to make a choice advancing his own financial interest to the detriment of Marrera's interest. Marrera argues that the potential conflict created by the fee arrangement developed into an actual conflict when his lawyer chose to take Marrera to Hollywood because the trip advanced counsel's own financial interest at the expense of Marrera's defense. Counsel, it is claimed, risked Marrera's defense for his own economic gain. Marrera's argument, however, only focuses on half of the story. Marrera too had an interest in taking the trip. Not only did Marrera pay his counsel by taking the trip, but he also stood to receive fifty percent of any proceeds from any sale of movie rights, or in his words to the police, to make "another million." Marrera weighed, in effect, the attorney's services and the potential movie rights proceeds against the potential adverse effect on his defense and chose to go to Hollywood. The real conflict then was not between Marrera and his attorney but between Marrera's interest in acquittal and Marrera's interest in profiting from his illegitimate act. Marrera weighed his own conflicting interests, decided that on balance his interests were best served by taking the trip, and willingly went to Hollywood.[7] We conclude that the potential conflict in this case never developed into an actual conflict.

■ Assuming *arguendo*, however, that there was an actual conflict in this case, we now consider whether the conflict adversely affected counsel's "performance." The first issue is how broadly to read "performance." The government urges us to limit *Cuyler* to its facts and to define performance as a choice made by a defense attorney *at trial*. Under this view defense counsel's decision to take Marrera to Hollywood would not constitute "performance" since it was not a choice made at trial.

We think this reading of "performance" is too narrow for it excludes the multitude of decisions defense counsel often make before and after trial, many of which have an effect on the ultimate defense as great as or greater than decisions made at trial. *See United States v. Mavrick*, 601 F.2d 921, 931 (7th Cir.1979) ("An attorney's joint representation of multiple defendants ... may affect a criminal defendant adversely not only during the jury trial on the issue of guilt, but at any stage of a criminal proceeding."). In *Hearst*, for example, two of F. Lee Bailey's alleged conflict-tainted choices, on which the court based its remand for a factual hearing, were choices made outside of court, prior to trial: Bail-

---

**6.** Although *Cuyler* involved a conflict based on multiple representation, we agree with the Ninth Circuit that the test is equally applicable to cases such as this, where the alleged conflict is based on the attorney's financial interests. *See United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). *But see People v. Washington*, 101 Ill.2d 104, 77 Ill.Dec. 770, 461 N.E.2d 393 (holding *Cuyler* actual-conflict-of-interest test limited to multiple-representation situations), *cert. denied*, —— U.S. ——, 105

S.Ct. 442, 83 L.Ed.2d 367 (1984) (three justices dissenting).

**7.** In this respect the case is distinguishable from *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981), another case where the alleged conflict resulted from defense attorney's interest in publicity rights to defendant's story. In *Hearst* the defendant, Patty Hearst, did not, unlike Marrera, share any financial interest with her attorney in the hoped-for proceeds from sale of the story behind the crime.

ey's decision not to seek a needed continuance and his decision not to seek a change of venue, both decisions allegedly to advance Bailey's own interests in publishing the Hearst story. We thus read "performance" to refer to any defense counsel decision which can reasonably be expected to affect the ultimate defense whether that decision be made before, during, or after trial. The decision Marrera criticizes—that of taking Marrera to see the producers—qualifies as "performance" under this definition because the decision, although made before trial, could reasonably have been expected to affect Marrera's defense.

We now consider whether the conflict-tainted choice to take the trip to Hollywood adversely affected Marrera's defense. Marrera argues that the trip to Hollywood adversely affected his defense when the prosecution referred to the trip in its cross-examination of Marrera. Concerning the trip the jury learned that Marrera took the trip and that he may have talked to some producers and told them that he knew all of those involved in the robbery. Of these references to the Hollywood trip the judge struck all but Marrera's own testimony that he took the trip.

The limited Hollywood evidence that was properly left before the jury corroborated Marrera's statement to the Chicago police by suggesting that he was serious about the book. That police statement, which can be construed as an admission, led into the matter of Marrera actually going to Hollywood to pursue the book idea. That much the trial court admitted without objection and allowed to stand. There was no error, much less clear error, in the court's exercise of discretion in letting stand that relevant evidence. When, however, the government suggested by its questionss what Marrera may have said to the producers, Marrera's counsel objected, although in so doing he improperly sought to testify in rebuttal. The objectionable testimony was stricken by the trial judge who fully admonished the jury to totally disregard what the government had done, calling it unfair. If anyone suffered from that ex-change, it was the government when it was chastised by the trial judge.

Before the jury, not only did Marrera deny he had said anything of the sort suggested by the government, but his trial counsel, though not under oath and not a witness, did manage in effect to testify and confirm Marrera's version. The trial court said the whole episode had been poorly handled by both parties, and we agree, but the trial judge avoided error by his personal appeal and his complete and understandable instruction to the jury. It was more than the mere reading of a stereotyped instruction lost in a maze of other instructions. We consider it to have been completely effective.

Marrera's counsel's ethical breach is separate from the evidentiary and legal fallout before the jury, but this is not a proceeding to discipline counsel. Even if it were, we would not discipline counsel by freeing his client.

Marrera in argument develops only the negative view of the Hollywood event, that his own counsel exposed him as looking greedy, ·not benevolent before the jury. Yet a jury might have viewed the Hollywood trip as consistent with innocence, believing that Marrera went to Hollywood not to sell an account of bungling burglars being convicted with all the details already spread on the public trial record, but to sell the more appealing story of an innocent Marrera betrayed by his scheming friends who went south with all the 4.3 million leaving Marrera to be rescued by his great lawyer.

During final arguments the government made no reference whatsoever to the Hollywood problem and defense counsel devoted only a couple of lines to it, saying that he had thought that Purolator would make a good story, but that his client, Marrera, was not interested. He said, nevertheless, that he found Marrera good company.

Marrera's defense was almost non-existent. He testified that nothing unusual happened while he was on duty that weekend at Purolator except the fire itself, and tried to minimize his relationships with his

co-conspirators. His father testified about the grandmother's vacant house, but not how the Hawthorne money got in her basement. The father also mentioned that the fumes from the vault fire had had serious physical effects on his son, the defendant. The evidentiary aspects of those physical effects constitute the remaining issue in this case.

Finally we note that the trial judge found that Marrera's counsel "represented the defendant at the trial with complete loyalty and with an acceptable level of competence."

The Hollywood arrangement was unethical, but we find that it did not create an actual conflict or adversely affect Marrera's defense counsel's performance. We therefore affirm the district court's refusal to grant a new trial.[8]

### IV.

Marrera attempted to turn this criminal trial into a tort action against the government or the Chicago police by trying to show that they had custody of him when the effects of the fumes from the vault fire were discovered, and therefore were somehow responsible for his poor physical condition. It appears that the vault fire fumes may have affected Marrera's speech or demeanor. The judge found that tort responsibility issue irrelevant, and so do we. In this court Marrera now argues a new reason for the admission of that physical disability evidence, saying that it was necessary for the jury to understand and to judge his demeanor and credibility. The district judge did not have the benefit of that argument so we will not pursue it. *Saltzman v. Fullerton Metals Co.*, 661 F.2d 647 (7th Cir.1981). From the record, however, it is plain that Marrera did have the chance to explain to the jury his demeanor and speech eccentricities. The jury was made fully aware that the defendant was in ill health at the trial, but had not

been at the time of the robbery. There was nothing more to be said on that issue.

The conviction is AFFIRMED.

FAIRCHILD, Senior Circuit Judge, concurring.

With respect, I do not believe that the cited portions of *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), control the claim of conflict of interest made here. *Cuyler* dealt with the possibility of conflict where an attorney represents two or more defendants. Multiple representation is not present here.

Because there was no evidentiary hearing, we are assuming *arguendo* the truth of Marrera's allegation that his counsel had a financial interest in exploiting the movie rights. We necessarily assume also that counsel did not adequately warn Marrera of the risk of apparent self-incrimination involved in the trip to Hollywood.

In this peculiar set of facts, and unlike most situations where counsel has a conflict of interest, we can identify the sole inadequacy of counsel which may have been the result of the conflict, *i.e.*, counsel's arranging the Hollywood trip. We can also identify the only adverse impact produced by the conflict, *i.e.*, the introduction of evidence concerning the trip and the adverse implications the jury may have drawn therefrom.

I concur in affirmance because I am wholly satisfied the verdict would have been the same if there had been no conflict and no Hollywood trip.

---

**8.** As an alternative Marrera seeks a remand for an evidentiary hearing on the fee arrangement, but we need not reach that alternative. We have the trial record. The petition fails to allege any specific counsel deficiencies affecting the record other than the fee arrangement itself and its evidentiary consequences. There is nothing requiring additional evidence.