MARCUS, Justice.
Joseph Floyd Carmouche, Jr. was indicted by the grand jury for the first degree murder of Mrs. Augusta (“Gussie”) B. Young in violation of La.R.S. 14:30. After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the recommendation of the jury. Defendant appealed his conviction and sentence to this court, urging six assignments of error. On appeal, however, a serious question was raised for the first time as to whether the defense attorney labored under a conflict of interest which had deprived defendant of effective assistance of counsel. Accordingly, defendant’s case was remanded to the district court “for the appointment of a new attorney to represent the defendant, for the development of additional facts not of record pertaining to whether the defense counsel’s performance was deficient and whether the deficiencies, if any, prejudiced the defense or deprived the defendant of a conscientious advocate for his life, and for the trial court’s decisions on these issues.” State v. Carmouche, 480 So.2d 728, 729 (La.1985).
On remand, the trial court found that, even if defense counsel had been subject to an actual conflict of interest, that conflict had not adversely affected his performance and thus ruled that defendant had not been deprived of effective assistance of counsel. On his second appeal, defendant assigns this ruling as error and relies on it and his original six assignments of error[1] for reversal of his conviction and sentence.
FACTS
The victim in this case, eighty-one year old Augusta B. Young, lived alone near Lawtell, Louisiana. She talked on the telephone daily with Nora Johnson, a friend of many years. At about 9:00 a.m. on March 13, 1984, Mrs. Johnson called Mrs. Young and spoke with her briefly, promising to call again when she returned from a visit to the doctor. About 3:30 or 4:00 that afternoon, Mrs. Johnson attempted to phone Mrs. Young, but there was no answer. Mrs. Johnson phoned twice after supper, but Mrs. Young still did not answer. Alarmed that Mrs. Young was not answering her telephone, Mrs. Johnson alerted Mrs. Young’s neighbors, who went to Mrs. Young’s house to investigate. Upon entering Mrs. Young's house, the neighbors found Mrs. Young’s dead body lying on the floor in the doorway between the living room and bedroom. There was blood on her face from a gunshot wound to her head, her blouse had been pulled up over her breasts, and she was nude from the waist down. The police were called and at about 8:00 p.m., Billy Frilot of St. Landry Parish Sheriff’s Department arrived to investigate.
Dr. Glenn Larkin, a forensic pathologist, arrived at the scene of the crime about 10:55 p.m. Dr. Larkin determined that the victim had died from a single gunshot wound to her head through the right eye and estimated the time of death to be between 9:00 a.m. and 3:00 p.m. During his autopsy of the victim, he removed hairs found on the victim’s body and took vagi *794 nal, rectal, and oral smears. He found a tear in the lining of her vagina which was consistent with forceful sexual intercourse. There was a bruise on the victim’s thigh which could have been made by pinching, squeezing, or by a blow. Dr. Larkin also found contusion abrasions compatible with suction on the victim’s right breast. There was also a small wound on the victim’s hand which Dr. Larkin characterized as a defensive wound.
Forensic scientists from the Louisiana State Police Crime Lab collected evidence at the crime scene and received more from Dr. Larkin following the autopsy. Testing revealed pubic hair on the bedspread which had been on the victim’s bed. The hair was negroid, and microscopic examination showed that all the characteristics of the hair were the same as defendant’s pubic hair. Hairs found on the victim’s right buttock and on the right side of her pubis microscopically matched defendant’s pubic hair (and the hair on the bedspread). A hair found on the victim’s chin was found to match defendant’s head hair. Swabs taken from the vaginal area tested positive for seminal fluid, sperm, and blood; swabs taken from material on the victim’s thigh tested positive for seminal fluid and blood.
At the crime scene, police also found the victim’s wallet on her bed. The wallet was empty of all cash but contained a government supplemental benefits check payable to the victim and which she received monthly about the first of the month. Prints were lifted from the check and the wallet. A state fingerprint analyst subsequently found twenty-seven points of identity between the print found on the back of the check and defendant's left thumb print, twelve points of identity between a print on the front of the check and defendant’s right thumb print, and thirty points of identity between a partial palm print found in the wallet and defendant’s left palm print. Also at the crime scene, police found and videotaped bicycle tracks outside the victim’s home. The tracks went behind a pile of brush, and there were footprints going from the pile toward the road in the direction of the victim’s house.
Subsequent investigation revealed that a young black man resembling defendant had been seen in the neighborhood of the victim’s house in the late morning of March 13,1984. Nelma Boutee, who worked for a neighbor of the victim, stated that she had noticed a boy, who looked like her son, riding a bicycle and wearing a shirt like one her son had, at 11:30 a.m. The boy had come from the direction of the victim’s house and was riding in the direction of the local grocery store owned by Mr. Elton Bihm. Mrs. Boutee later positively identified defendant in both a photographic lineup and a live line-up as the young man she had seen. Deputy Sheriff Oneil Antoine also saw defendant riding in the direction of Bihm’s store. Although he was uncertain of the exact time, he thought it was between 10:30 and 11:00 a.m. Elton Bihm stated that on March 13, 1984, defendant came into his store about 11:00 a.m. or a little later and purchased a soft drink. Edgar Bellard had been in Bihm’s store just before defendant and saw defendant pushing a bicycle as he approached the store. Defendant told him that the bicycle was broken and asked Bellard for a ride home. Bellard agreed and took defendant home at a time between 11:30 and 11:45. Defendant paid Bellard five dollars for the short ride home.
On March 26, 1984, defendant was arrested by the St. Landry Parish Sheriff's Department and charged with aggravated battery, attempted armed robbery, aggravated rape, and first degree murder in connection with the death of Mrs. Young. On the same day, Mr. Edward Lopez and Mr. Thomas DeJean were appointed by the court to represent defendant.
CONFLICT OF INTEREST
Defendant first contends that his attorney Lopez’s dual representation of him and prosecution witness Ernest Jenkins created a conflict of interest which denied defendant his right to the effective assistance of counsel as guaranteed by the sixth amendment to the federal constitution and article 1, section 13 of our state constitution. Defendant argues that, because of conflicting *795 interests, Lopez failed to discredit the damaging testimony of Jenkins (who was also Lopez’s client) for fear of jeopardizing Jenkins’ then unconcluded plea bargain arrangements with the state in an unrelated case.
On the last day of trial, prior to the close of the state’s case, the state served on defendant a “768 Notice and Discovery” in which it notified him that the state intended to introduce inculpatory statements made by defendant to a jail cellmate, Ernest Jenkins. Because Jenkins had only agreed to testify on the previous day after the close of proceedings for the day, defense counsel Lopez was unaware that Jenkins was to testify until that morning. Defendant objected on the ground that the state had failed to give him notice of its intent to use these statements prior to the state’s opening statement as required by La.Code Crim.P. art. 768. Lopez mentioned in passing to the court that he was also the attorney for Ernest Jenkins (for whom he had negotiated an as-yet unconsummated plea bargain in an unrelated criminal matter)[2] and expressed some concern that there might be a conflict of interest. The following colloquy took place between the court and Lopez:
MR. LOPEZ: I would also state to the court, that the individual involved in this particular case who intends to make this statement is a client of my own. I represent Mr. Jenkins.
THE COURT: You represent him by court appointment.
MR. LOPEZ: Yes. It may be a distinct disadvantage to me because I may not be able to cross-examine Mr. Jenkins on certain things because there maybe a conflict of interest in what he told me.
THE COURT: The only foreseeable thing Mr. Lopez where you could question him would be as to whether the question about the subject matter on which you represent him and he’s only been charged and he can’t be questioned about that. Unless you question him and there’s been some sort of deal that’s been. I mean if you want to question him on bias and that would be beyond your representation. That would be cured simply by appointing another lawyer. Let’s proceed.
However, Lopez did not ask to be relieved of representation of Jenkins, request a recess for purposes of developing impeachment evidence, or move for a mistrial. Moreover, after interviewing Jenkins, the trial judge offered defense counsel additional time to meet the evidence which the state was about to put on in connection with this particular witness. Lopez declined the offer, stating: “I’m satisfied that if I’d have ten more hours ... I’d still be where I am right now.” Jenkins took the stand and proceeded to relate a damaging confession made to him by defendant while the two were incarcerated in the same cell block. Although defense counsel had questioned Jenkins closely for possible bias in a hearing outside the presence of the jury prior to his testimony, defense counsel did not raise the issue of bias in his brief cross-examination of Jenkins before the jury since Jenkins had, in the prior hearing, firmly denied that his testimony had been induced by promises of a plea bargain for a reduced sentence.
On remand, Jenkins testified that he was under the impression that he would be allowed a plea bargain for a reduced sentence of five years for his unrelated charge (five years less than the plea bargain which Lopez had previously negotiated for Jenkins) in return for his testimony. Lopez testified that he became aware of this deal some months after the trial, but was not aware of any such deal at the time of defendant’s trial. The district attorney’s office, however, denied that Jenkins had been promised anything other than protection from other inmates in return for his testimony. Accordingly, the trial court applied the analysis of Cuyler v. Sullivan, *796 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and found that because any conflict of interest resulting from defense counsel's dual representation of defendant and Jenkins did not adversely affect defense counsel’s performance at trial, defendant was not deprived of his right to the effective assistance of counsel.
It is well settled that multiple representation is not per se illegal and does not violate the sixth amendment to the United States Constitution or article 1, section 13 of the Louisiana Constitution unless it gives rise to a conflict of interest. State v. Kahey, 436 So.2d 475 (La.1983). In State v. Edwards, 430 So.2d 60 (La.1983), this court summarized the law applicable to claims that dual or multiple representation resulted in the ineffective assistance of counsel:
The relationship between joint representation and ineffective assistance of counsel has been thoroughly examined by the United States Supreme Court in its opinions rendered in Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 708, 64 L.Ed.2d 333 (1980). State v. Marshall, 414 So.2d 684 (La.1982). In Holloway, defendant raised the issue of a conflict of interest prior to a joint trial. In this situation, the Court held that the trial judge is required “either to appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel.” In Sullivan, the defendant did not raise the issue of conflict of interest either before [or] during his separate trial. Rather, the defendant ... raised the issue for the first time after his trial. In this situation, the Court held that a defendant “in order to establish a violation of the Sixth Amendment ... must demonstrate that an actual conflict of interest adversely affected his lawyer’s performance_” Recently, in State v. Marshall, supra, we held that the time at which a concern over the effects of multiple representation is raised is the determinative factor in deciding whether the rules of Holloway or Sullivan are controlling. [Footnote omitted.]
However, the instant case presents an issue of first impression in Louisiana: that is, which rule controls where the trial court is alerted to the possibility of a conflict of interest from dual representation during trial, but no formal objection is raised to the dual representation.
As a starting proposition, we note that the sixth amendment does not require “state courts themselves to initiate inquiries into the propriety of multiple representation in every case.” Cuyler v. Sullivan, 446 U.S. at 346, 100 S.Ct. at 1717. In fact, “[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.” [Emphasis supplied.] Id. at 347, 100 S.Ct. at 1717. However, federal jurisprudence has also held that “where a defendant puts a trial judge on notice of the alleged conflict before or during trial and the trial court fails to inquire into the conflict, a reviewing court will presume prejudice upon a showing of possible prejudice.” United States v. Marrera, 768 F.2d 201, 205 (7th Cir.1985), citing Holloway, supra, and Cuyler, supra. Thus,
[t]o decide whether to apply the Holloway test and afford defendant a per se presumption of prejudice or to apply the Cuyler test and grant the presumption of prejudice only upon a showing of actual conflict and adverse effect on counsel’s performance, we must first determine whether the defendant put the trial judge on notice of the alleged conflict.
Marrera, 768 F.2d at 206.
Defense counsel in the instant case made no formal objection or motion to withdraw from the representation of either defendant or Jenkins. Defense counsel made only the most fleeting reference to a vague possibility of conflict stemming from his dual representation. He did not elaborate on that possibility either at that time or later in the trial. At the time defense counsel made reference to the alleged conflict of interests, the conflict was potential only. As the trial judge pointed out, the potential conflict would become actual only if Lopez, *797 in his capacity as defense counsel, were to cross-examine his former client Jenkins regarding confidential matters pertaining to Lopez’s representation of Jenkins or regarding possible bias on the part of Jenkins; in that event, said the trial judge, the problem would be cured by simply appointing other counsel. When faced with an analogous situation, the court in United States v. Marrera, supra, held that
[t]he trial judge gave [defense] counsel forewarning of the potential conflict and thereafter reasonably relied on defense counsel to bring to the court’s attention any conflict that might arise during the course of his representation....
[Because c]ounsel never mentioned the conflict problem again [, t]he judge did not neglect his duty in not inquiring further into the potential conflict problem. See Cuyler, 446 U.S. at 346-48, 100 S.Ct. at 1717-18 (“Absent special circumstances, ... trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist”).
Marrera, 768 F.2d at 206. And
[s]ince ... the judge was not put on notice of an actual conflict and fulfilled his duty in warning counsel of the possibility for conflict, we apply the Cuyler test, that is, we inquire whether the potential conflict ever developed into an actual conflict which adversely affected defense counsel’s performance.
Marrera, 768 F.2d at 207. For the same reasons, we consider that the Cuyler test, that is, whether the potential conflict ever developed into an actual conflict which adversely affected defense counsel’s performance, is applicable here. Accord, State v. Kahey, supra; State v. Rowe, 416 So.2d 87 (La.1982).
The first inquiry under the Cuyler test is whether the potential conflict ever developed into an actual conflict requiring defense counsel to make a choice advancing the interest of his client Jenkins to the detriment of defendant’s interest. An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties. State v. Kahey, supra. However, as the trial court pointed out, any conflict here was only potential until such time as defense counsel might choose to cross-examine and impeach his client Jenkins before the jury regarding confidential matters or bias, particularly in relation to Jenkins’ reasons for testifying. In fact, counsel never pursued such a line of cross-examination. Outside the presence of the jury, in a hearing conducted pursuant to La.R.S. 15:451,[3] Lopez questioned Jenkins closely about his reasons for testifying against defendant, clearly trying to elicit an admission that Jenkins’ testimony had been induced by promises of a plea bargain for a reduced sentence and was therefore biased. However, Jenkins firmly denied any such inducement, and Lopez, who by his own admission did not at that time know of the alleged plea bargain for a reduced sentence of five years, saw no point in cross-examining Jenkins to the same effect before the jury. Instead, Lopez made a valid tactical decision to cross-examine Jenkins as little as possible so as to minimize the impact of the highly damaging confession which defendant had allegedly made to Jenkins. Thus, because Lopez felt it was unnecessary to cross-examine and impeach Jenkins for bias before the jury, the potential conflict of interest never ripened into an actual conflict of interest during trial. It was not until several months after trial that Lopez allegedly learned facts which caused him to believe that Jenkins’ testimony had been induced by promises of a plea bargain for a reduced sentence and further leniency in the terms of that sentence. It was at this point in time that an actual conflict of interest first developed.
Given that an actual conflict developed only after trial, under Cuyler we must *798 consider whether the conflict affected counsel’s performance at trial. Obviously it could not and did not. Defense counsel’s brief cross-examination of Jenkins was due, not to any fear that Jenkins’ original plea bargain would be jeopardized, but rather to a tactical decision by defense counsel “not to focus that much attention on the evidence that was ... given.” Even if this tactical decision were unwise, the possibility that another approach should be used in a trial with better results to a defendant exists in every case and is far from making out a deprivation of a constitutional right. State v. Kakey, supra; State v. Edwards, supra. Moreover, at the remand hearing, defense counsel testified that he did not think that his dual representation of both defendant and Jenkins adversely affected his performance at defendant’s trial. Accordingly, we conclude that, under the analysis of Cuyler, defendant was not deprived of his constitutional right to the effective assistance of counsel. The trial court did not err in so ruling. This assignment of error is without merit.
ASSIGNMENT OP ERROR NO. 4
Defendant contends the trial judge erred in allowing the testimony of Ernest Jenkins concerning inculpatory statements of defendant without giving notice to defendant prior to the state’s opening statement as required by La.Code Crim.P. art. 768. He argues that because of the lack of such notice, he was unfairly surprised by Jenkins’ testimony and was therefore unable to prepare an adequate defense.
In pre-trial discovery and in a pre-trial notice filed in accordance with La.Code Crim.P. art. 768, the state indicated that it intended to introduce a number of inculpa-tory statements against defendant. It made no mention of the confession and inculpatory statements made by defendant to Ernest Jenkins because it was unaware of the existence of such statements. However, after the close of proceedings on the fourth day of defendant’s trial, the state learned for the first time that defendant had made a confession and certain inculpa-tory statements[4] to Ernest Jenkins, who had been his jail cellmate in the St. Landry Parish jail. The state immediately attempted to locate defense counsel to inform them of the newly-discovered statements but was unsuccessful in these attempts.
Accordingly, on the fifth day of trial, the state filed a second 768 notice, informing defendant that it intended to introduce the statements made to Ernest Jenkins. Defense counsel objected. The trial judge held an evidentiary hearing to determine when the state had learned of the existence of these statements. After the hearing, the trial judge found that although the state had exercised due diligence in its pretrial investigation, nevertheless the state did not learn of Jenkins’ statement until the fourth day of trial and could not possibly have complied with the literal terms of art. 768. Therefore, the trial judge overruled defendant’s 768 objection to the testimony of Jenkins and allowed Jenkins to testify as to the statements made to him by defendant.
La.Code Crim.P. art. 768 provides:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state’s opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The purpose of the notice required by art. 768 is to prevent surprise and allow adequate time for preparation of the defense. State v. Knapper, 458 So.2d 1284 (La. *799 1984). However, when art. 768 is not followed to the letter, this court will examine the entire record and determine whether the defendant was prejudiced by the noncompliance and whether he suffered a substantial violation of his statutory rights. La.Code Crim.P. art. 921;[5] State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970).
The record shows that the state was neither dilatory nor in bad faith in failing to discover and disclose the evidence of the confession and inculpatory statements made by defendant to Jenkins. Furthermore, before Jenkins testified before the jury, the trial judge offered defense counsel additional time to meet the new evidence; however, Lopez declined the offer of additional time, stating that if he had another ten hours he would still be at the same point. Finally, defendant does not suggest how his defense would have been different had he been apprised that the state intended to introduce these statements against him. State v. Knapper, supra. We find, therefore, that defendant was not prejudiced by the state’s mid-trial 768 notice of its intent to use the statements made to Ernest Jenkins. Hence, the trial judge did not err in overruling defendant’s objection.
Assignment of Error No. 4 is without merit.
ASSIGNMENT OF ERROR NO. 5
Defendant contends that there was insufficient evidence to support his conviction for the first degree murder of Mrs. Young.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Garcia, 483 So.2d 953 (La.1986); State v. Porretto, 468 So.2d 1142 (La.1985); State v. Wright, 445 So.2d 1198 (La.1984). Thus, the relevant inquiry on appeal in the instant case is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that defendant was guilty of the first degree murder of Mrs. Young. Jackson v. Virginia, supra.
The murder of Mrs. Young was an unwit-nessed crime. Nevertheless, there is more than ample circumstantial evidence linking defendant to the crime. Defendant’s fingerprints were found on Mrs. Young’s government check (which had only arrived some ten days before the crime) and on her wallet despite defendant's assertion that he had not been to Mrs. Young’s house in ten years. An expert in hair analysis testified that all the foreign pubic hairs and one of the foreign head hairs found on Mrs. Young’s body matched those of defendant. A holster and an empty box of .22 caliber bullets found in defendant’s room were compatible with the .22 caliber bullet retrieved from Mrs. Young’s body. Furthermore, a number of eyewitnesses established that defendant was in the neighborhood of Mrs. Young’s house on the morning of the murder. Nelma Boutee positively identified defendant (in both a photographic line-up and a physical line-up) as the young black man she had seen on the day of the murder at about 11:30 a.m. She *800 testified that he was riding a bicycle at a fast pace from the direction of Mrs. Young’s house and looking behind him. Deputy Oneil Antoine and Edgar Bellard also saw defendant riding or pushing a bicycle about the same time Nelma Boutee saw him. Additionally, the record fully supports the conclusion that the murder was committed while defendant was engaged in the perpetration of aggravated rape. The evidence clearly shows that the victim had sexual intercourse before her death. Swabs taken from the vaginal area tested positive for seminal fluid, sperm, and blood; swabs taken from material on the victim’s thigh tested positive for seminal fluid and blood. There were bruises on the victim’s nude body, a tear in the lining of her vagina, and a defensive wound on her hand, indicating resistance by the victim. The attack ended with the victim’s being shot to death. It is therefore a reasonable conclusion that defendant was armed with a dangerous weapon and that the victim was raped under threats of great and immediate bodily harm accompanied by apparent power of execution. Finally, the jury heard Ernest Jenkins testify that defendant confessed to both the rape and the murder when the two were in the same cell block in the St. Landry Parish jail.[6]
Considering all the evidence, we find that this evidence, viewed in the light most favorable to the prosecution, excludes every reasonable hypothesis of innocence. Jackson v. Virginia, supra. Therefore, the jury did not err in finding defendant guilty of the first degree murder of Mrs. Young.
Assignment of Error No. 5 is without merit.
SENTENCE REVIEW
Article 1, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La.Sup.Ct.R. 28, § 1, which provides:
Review Guidelines. Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury’s finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
(a) Passion, prejudice or any other arbitrary factors
There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death sentence.[7] Nor has any argument to that effect been raised by defendant.
(b) Statutory aggravating circumstances (Assignment of Error No. 6)
The jury found that two of the aggravating circumstances listed in La.Code Crim.P. art. 905.4 were present in this case:
(a) the offender was engaged in the perpetration or attempted perpetration of aggravated rape, ... aggravated burglary, [and] ... armed robbery_
(g) the offense was committed in an especially heinous, atrocious, or cruel manner. ...
Defendant contends that the jury's finding of aggravating circumstances and recom *801 mendation of the death penalty are contrary to the evidence.
The record amply supports the jury’s conclusion that the murder was committed while defendant was engaged in the perpetration of aggravated rape. Aggravated rape at the time of this crime was defined as follows:
Aggravated rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) Where the victim resists the act to the utmost, but whose resistance is overcome by force; or
(2) Where the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution; or
(3) Where the victim is prevented from resisting the act because the offender is armed with a dangerous weapon; or
(4) Where the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
La.R.S. 14:42.[8] The evidence clearly shows that the victim had sexual intercourse before her death. Swabs taken from the vaginal area tested positive for seminal fluid, sperm, and blood; swabs taken from material on the victim’s thigh tested positive for seminal fluid and blood. There were bruises on the victim’s nude body, a tear in the lining of her vagina, and a defensive wound on her hand, indicating resistance by the victim. Furthermore, the attack ended with the victim’s being shot to death. Given that fact, the jury could reasonably have concluded that the offender was armed with a dangerous weapon, despite the gun’s not being admitted in evidence,[9] and that the victim had been raped under threats of great and immediate bodily harm accompanied by apparent power of execution. The jury’s finding that defendant committed this murder while engaged in the perpetration of aggravated rape is clearly supported by the evidence. Accordingly, it is unnecessary for us to consider the sufficiency of the evidence for the findings that defendant committed this murder while engaged in the perpetration of aggravated burglary and armed robbery.
Since the jury found one statutory aggravating circumstance (La.Code Crim.P. art. 905.4(a)) and that circumstance is clearly supported by the record, we find it unnecessary to decide whether the jury erred in finding that the offense was committed in an especially heinous, atrocious, or cruel manner (the second aggravating circumstance). The failure of one aggravating circumstance would not invalidate the death penalty if another aggravating circumstance is also found and is upheld on review. La.Code Crim.P. art. 905.3; State v. Bates, 495 So.2d 1262 (La.1986).
(c) Proportionality to the penalty imposed in similar cases
Supreme Court Rule 28, § 4 provides that the district attorney shall file with this court a list of each first degree murder case in the district in which sentence was imposed after January 1, 1976. The list shall include the docket number, caption, crime convicted, sentence actually imposed and a synopsis of the facts in the record concerning the crime and the defendant.
In the instant case, the sentence review memorandum submitted by the district attorney stated that there had been no other first degree murder cases in the district since January 1, 1976. However, our research reveals that, including the instant case, there have been five convictions of first degree murder in the Twenty-Seventh Judicial District Court in and for the Parish of St. Landry since January 1, 1976.[10] Out *802 of these five, the death penalty was recommended by the jury in only two cases, including the present case.[11] In both of these cases, the defendants were the actual killers. In State v. Bates, the other death penalty case in this district, the jury found that Bates had shot and killed a hitchhiker while engaged in the perpetration of an armed robbery, a statutory aggravating circumstance. Of the remaining cases (in which a sentence of life imprisonment was imposed), one was an armed robbery/murder case in which the jury was unable to reach a unanimous recommendation of the death penalty,[12] one was a case in which the conviction of first degree murder was reduced on appeal to this court to second degree murder because the evidence was found insufficient to support the jury’s finding of an aggravating circumstance,[13] and one was a case in which the jury might reasonably have found one or more mitigating circumstances justifying imposition of a life sentence.[14] In the instant case, the victim was an 81-year-old woman of good reputation in her community. She was raped and murdered within the confines of her own home. We conclude, therefore, that the sentence of death imposed in this case is not inconsistent with the other first degree murder convictions in this district.
According to the Uniform Capital Sentencing Report, defendant, a black male of average intelligence, was nineteen years of age at the time the crime was committed. He has never been married. He only completed the seventh grade in school. Although defendant comes from an apparently stable home environment, he has a history of problems and outbreaks of violence at the schools he has attended and at home. At the time of the crime, defendant had aggravated battery and attempted armed robbery charges pending against him arising out of an incident which had occurred approximately one month before the murder. He has been diagnosed as having various substance use disorders, including alcohol and marijuana dependency. The psychiatric evaluation further revealed that defendant is subject to episodic adult antisocial behavior, undersocialized aggressive reaction, and other conduct disorders.
After having considered the above factors, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Hence, based on the above criteria, we do not consider that defendant’s sentence of death constitutes cruel, excessive, or unusual punishment.
DECREE
For the reasons assigned, defendant’s conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that court denies his petition for certio-rari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing rules for applying for rehearing of denial of certiorari; or (d) that court denies his application for rehearing.
CALOGERO and DENNIS, JJ., dissent for the reasons assigned by LEMMON, J.
LEMMON, J., dissents and assigns reasons.

. Assignments of Error Nos. 1, 2 and 3 do not represent reversible error nor do they involve legal issues not governed by clearly established principles of law. They will be treated in an appendix which will not be published but which will comprise part of the record in this case.

. At the time of this trial, the district attorney and Lopez had already confected a plea bargain for Jenkins whereby Jenkins would enter a plea of guilty to an aggravated battery and would receive the maximum penalty of ten years at hard labor. In return, other charges of armed robbery, second degree battery, and simple burglary were to be dropped. However, Jenkins had not, at the time of this trial, entered a formal plea of guilty.

. La.R.S. 15:451 provides as follows:
Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.

. Jenkins stated that when he asked defendant if he had committed the crime of which he was accused, defendant nodded his head yes. When Jenkins asked why defendant had done it, defendant replied that "he [had gotten] up on the wrong side of the bed." Defendant further told Jenkins that "when he left [the victim’s house,] he saw a woman hanging clothes but she didn’t see him,” thus corroborating the testimony of Nelma Boutee, who claimed to have seen defendant in the area of the victim’s house on the morning of the murder. Finally, when Jenkins asked defendant why he had raped Mrs. Young, defendant replied that "that bitch had good pussy.”

. La.Code Crim.P. art. 921 provides:
A judgment or ruling shall not be reversed by an appellate court because of any error, de-feet, irregularity, or variance which does not affect substantial rights of the accused.

. Defendant also made two other confessions, neither of which was received into evidence. The first was a videotaped confession made by defendant to the St. Landry Parish police. However, the trial judge ordered part of this confession suppressed and therefore the state decided not to introduce the confession into evidence. The second confession was made by defendant to his mother; however, the state also declined to introduce this confession into evidence. Since neither of these confessions is in evidence, we do not consider them in testing the sufficiency of the evidence against defendant.

. The state introduced no evidence to show that the murder was committed in an especially heinous, atrocious, or cruel manner.

. The 1984 Legislature added a fifth circumstance: "When two or more offenders participated in the act." This did not become effective until September 3, 1984.

. The police located the minder weapon as a result of a suppressed statement. The prosecution did not attempt to introduce the gun in evidence.

.The other cases were: State v. Bates, 495 So.2d 1262 (La.1986); State v. Gibson, a case not appealed to this court and hence unreported (tried in September, 1985); State v. Andrews, *802 452 So.2d 687 (La. 1984); State v. Delahoussaye, 443 So.2d 648 (La.App. 3d Cir.1983).

. The other case was State v. Bates, supra.

. State v. Gibson, supra (defendant shot and killed a hitchhiker after pistol whipping him and robbing him at gunpoint).

. State v. Andrews, supra (defendant threatened to kill two brothers but in fact killed only one; this court found that there was insufficient evidence to show that defendant intended to kill or inflict great bodily harm on more than one person, an aggravating circumstance).

.State v. Delahoussaye, supra (following an argument, defendant killed his companion with whom he had been drinking all night).